**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

------------------------------------------------------------------------ x

CRISTOBAL and THERESA ALVAREZ,                    :
CYTHERIA ARTIS, PAMELA BERRY,                     :
WILLIAM BOLEWARE, EARLIE BRADEN,                  :
ANNIE BROOKS, DEVIN L. and LINDA CRYMES,          :
EZELL and ALICE FOSTER, WILLIAM GARCIA,           :
CARMEN GARZA, HARRISON GIBBS,                     :   Civil Action No. _____
BERTERESA HARRIS, TERRANCE HILL,                  :
CURTIS and NETTIE HILL, SARA and MAURO            :
JIMENEZ, EMMA JOHNSON, FRANK KRESICH,             :   **JURY TRIAL DEMANDED**
CHINITA LINDSAY, LORI LOCKLEAR,                   :
MARITZA LOPEZ, WILLIAM LUCKETT,                   :
ANGELA MCFERRIN, MARGO MORRIS,                    :
DONALD MOSLEY, RAYMOND MOSLEY,                    :
SANDRA MUNIZ-GARZA, MELISSA PETERSON,             :
NATALIE ROBINSON, JOSE and NATALIA                :
SANCHEZ, MADELEINE A.P. SPANN, JOHN and           :
DELPHINE SULLIVAN, MICHEAL TRAMBLES              :
and CHANTHINI FOWLER, BERNICE VICTOR,             :
DWAYNE WASHINGTON, ISAAC                          :
WASHINGTON, JACQUELINE WASHINGTON-               :
BROWN, SARAH WILLIS, and BETTY ZIC,               :
                                                  :
                        Plaintiffs,               :
                                                  :
         v.                                       :
                                                  :
ATLANTIC RICHFIELD COMPANY,                       :
TESORO CORPORATION, E.I. DU PONT                  :
DE NEMOURS AND COMPANY,                           :
THE CHEMOURS COMPANY, U.S. SMELTER               :
AND LEAD REFINERY, INC., d/b/a U.S.S. LEAD        :
REFINERY, INC., MINING REMEDIAL                   :
RECOVERY COMPANY, ARAVA NATURAL                   :
RESOURCES COMPANY, INC., and MUELLER              :
INDUSTRIES, INC.,                                 :
                                                  :
                        Defendants.               :

------------------------------------------------------------------------ x

## COMPLAINT

By their *pro bono* attorneys of record, the above-named Plaintiffs file this Complaint against Defendants Atlantic Richfield Company, Tesoro Corporation, E.I. du Pont de Nemours and Company, The Chemours Company, U.S. Smelter and Lead Refinery, Inc., d/b/a U.S.S. Lead Refinery, Inc., Mining Remedial Recovery Company, Arava Natural Resources Company, Inc., and Mueller Industries, Inc. ("Defendants").  Plaintiffs allege as follows:

## I.     INTRODUCTION

1.      Plaintiffs bring this case to recover for damage done to their properties and emotional distress caused by Defendants, who owned and/or purchased lead refineries and other manufacturing processes in the Calumet neighborhood of East Chicago, Indiana, and who subjected Plaintiffs and Plaintiffs' properties to decades of continuous toxic contamination that continues to this day.

2.      For decades, Defendants' lead smelting, lead refining, and other manufacturing processes wreaked environmental havoc in the Calumet neighborhood of East Chicago.

3.      Defendants, flouting environmental laws and disregarding the safety and property interests of nearby residents, generated airborne emissions of contaminants from plant stacks and also leaked and/or spilled hazardous contaminants, including lead, arsenic, polycyclic aromatic hydrocarbons ("PAHs"), and other hazardous contaminants, including but not limited to cadmium, antimony, and mercury, into the surrounding area, thereby polluting the soil, groundwater, and interiors of Plaintiffs' homes with extremely dangerous levels of these hazardous contaminants.

4.      Lead contamination is associated with severe health risks, including various organ disorders, seizures, respiratory issues, behavioral problems, and learning disabilities.  Arsenic

contamination is associated with an increased risk of the development of skin, lung, and liver cancer, as well as lymphoma.  PAHs are associated with cataracts, kidney and liver damage, and jaundice, and an increased risk of skin, lung, bladder, and gastrointestinal cancers.

5.      Environmental contamination, even once remediated, also reduces property values and makes it difficult, if not impossible, for homeowners to sell their properties.

6.      Despite Defendants' knowledge of the dangers posed by such contamination to the health and property of residents living near their facilities, and future residents living near on or near their facilities, including Plaintiffs, Defendants failed to warn area residents, including Plaintiffs, of the contamination.  Defendants entirely failed to communicate *anything* regarding the contamination to the community in which they operated their facilities in, and they never disclosed to Plaintiffs the fact and extent of the contamination nor the dangers it posed. Plaintiffs did not know and had no reason to know that their health and properties were at risk.

7.      Defendants have never voluntarily agreed to remediate the contamination themselves.

8.      Rather, because of the severity of Defendants' contamination and the risks such contamination poses to residents' health, the United States Environmental Protection Agency ("EPA") placed the area where Plaintiffs own properties on the Superfund's National Priorities List (the "Superfund Site"), triggering EPA's duty to investigate, select, and execute a remediation plan under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601.

9.      EPA also kept residents in the dark about the contamination for years, and has only recently—and haphazardly—provided Plaintiffs with information regarding the contamination and the risks it poses to their health and properties.

-3-

10.     Since they first learned of Defendants' contamination, the community has held hundreds of meetings to address the remediation process.  Though many of those meetings have been attended by EPA and other government representatives, to the best of Plaintiffs' knowledge, not one person representing Defendants has ever attended a community meeting or otherwise provided outreach to the community regarding the contamination Defendants caused.

11.     The combination of contamination, inaction, and failure to inform has created wide-spread anxiety among the residents who own homes at the Superfund Site, including Plaintiffs.  Their property values have plummeted, and they cannot sell their homes.  Worse, they constantly worry about the health and safety of themselves and their families.  They no longer let their children play outside or let their grandchildren visit, and they are left to wonder whether the high incidents of respiratory issues, kidney disorders, cancer, asthma, and learning disabilities that occur frequently in their community were caused by lead and arsenic poisoning or other contaminants endemic to the Superfund Site.

12.     Once Defendants learned that it was even reasonably *possible* that they were responsible for contaminating residents' homes with lead, arsenic, and other hazardous contaminants, the standard of care, consistent the most basic level human decency, required them to reach out to the potential victims, warn residents of the issues, advise residents on how to protect themselves, and assist in remediation efforts.  Instead, decades later, to the best of Plaintiffs' knowledge, Defendants still have provided past and present residents living in the contaminated area, including Plaintiffs, with absolutely *no* acknowledgment of or information regarding the contamination.   Fear of liability is no excuse for silence or inaction.  No one needs to wait to be sued before fixing—or at least attempting to fix—the mess one creates.  The standard of care should not be measured against the all too common practice of corporate bad

actors who hunker down, obfuscate, and deflect responsibility. Defendants have failed to act with any level of decency, willfully and wantonly violating the standard of care they owe Plaintiffs.

13.     Plaintiffs thus bring this action to recover for the damage done to their properties and for the emotional distress caused by such damage, against the entities who either directly caused the contamination to their properties and/or neighborhood or who are successors in liability to such entities.

## II.     PARTIES

### A.     Defendants

14.     Defendant Atlantic Richfield Company ("ARCO") is a corporation organized under the laws of Delaware, with its principal place of business in California. ARCO is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana. ARCO is a successor in liability to International Lead Refining Company, International Smelting Company, International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, and The Anaconda Company. BP Amoco p.l.c. ("BP") acquired ARCO in April 2000, and ARCO transferred substantially all of its retail and refining assets to BP at that time. BP assumed the environmental liabilities of the assets it acquired and became the successor in interest to ARCO.

15.     Defendant Tesoro Corporation ("Tesoro") is a corporation organized under the laws of Delaware, with its principal place of business in Delaware. Tesoro is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana. Tesoro acquired ARCO and substantially all of its assets from BP in 2013. Pursuant to the Purchase and Sales

Agreement, Tesoro assumed the environmental liabilities of the assets it acquired and became the successor in interest to ARCO and BP.

16.     International Lead Refining Company, International Smelting Company, International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, The Anaconda Company, ARCO, BP, and Tesoro are collectively referred to throughout the Complaint as "ARCO."

17.     Defendant E.I. du Pont de Nemours and Company ("DuPont") is a corporation organized under the laws of Delaware, with its principal place of business in Delaware.  DuPont is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

18.     Defendant The Chemours Company ("Chemours") is a corporation organized under the laws of Delaware, with its principal place of business in Delaware.  Chemours is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

19.     Chemours was a subsidiary of DuPont and was successor in interest to DuPont's environmental liabilities.  DuPont recently restructured and created Chemours as a separate entity.  Chemours has assumed at least some portion of DuPont's liability.

20.     Defendants DuPont and Chemours are collectively referred to throughout the Complaint as "DuPont."

21.     Defendant U.S. Smelter and Lead Refinery, Inc., d/b/a U.S.S. Lead Refinery, Inc. ("U.S.S. Lead") is a corporation organized under the laws of Maine, with its principal place of business in Utah.  U.S.S. Lead is authorized to do business in Indiana and regularly transacts business in Lake County, Indiana.

22.     Defendant Mining Remedial Recovery Company ("MRRC") is a corporation organized under the laws of Delaware, with its principal place of business in Tennessee.  U.S.S. Lead is a wholly-owned subsidiary of MRRC.

23.     Defendant Arava Natural Resources Company, Inc. ("Arava") is a corporation organized under the laws of Delaware, with its principal place of business in Utah  MRRC is a wholly-owned subsidiary of Arava.

24.     Defendant Mueller Industries, Inc. ("Mueller") is a corporation organized under the laws of Delaware with its principal place of business in Tennessee  Arava is a wholly-owned subsidiary of Mueller.

**B.     Plaintiffs**

25.     Plaintiffs Cristobal and Theresa Alvarez are citizens of the State of Indiana and reside in East Chicago, Indiana.  The Alvarezes own the property located at 4714 Carey Street, East Chicago, Indiana and have lived there since they purchased the property in or around 2001. EPA sampled the soil at the Alvarezes' property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at the Alvarezes' property.

26.     Plaintiff Cytheria Artis is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Cytheria Artis and her mother, Tranece, own the property located at 443 Vernon Avenue, East Chicago, Indiana.  Tranece Artis purchased the property in or around 1955, and raised her family, including Cytheria, there.  Tranece Artis currently lives on the property. EPA sampled the soil at the Artis's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

27.     Plaintiff Pamela Berry is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Berry owns the property located at 4722 Carey Street, East Chicago, Indiana and has lived there since she purchased the property in or around 1999.

28.     Plaintiff William Boleware is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Boleware owns the property located at 4829 Drummond Street, East Chicago, Indiana and has lived there since he purchased the property in or around 1993.  EPA sampled the soil at Mr. Boleware's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Mr. Boleware's property.

29.     Plaintiff Earlie Braden is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Braden owns the property located at 508 East 151st Street, East Chicago, Indiana and has lived there since her mother purchased the property in or around 1950.  Ms. Braden's mother transferred her interest in the property to Ms. Braden in or around 1993.  EPA sampled the soil at Ms. Braden's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

30.     Plaintiff Annie Brooks is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Brooks owns the property located at 4741 Alexander Avenue, East Chicago, Indiana.  Ms. Brooks' mother purchased the property in or around 1977 and transferred her interest to Ms. Brooks.  EPA sampled the soil at Ms. Brooks's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

31.     Plaintiffs Devin L. and Linda Crymes are citizens of the State of Indiana and reside in East Chicago, Indiana.   The Crymes own the property located at 4915 Alexander

Avenue, East Chicago, Indiana, which Mr. Crymes' mother purchased in or around 1950 and transferred interest to the Crymes in or around 1998. The Crymes live in one unit of their property, their son lives in the second unit on their property, and they rent the third unit of their property. EPA sampled the soil at the Crymes's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

32. Plaintiffs Ezell and Alice Foster are citizens of the State of Indiana and reside in East Chicago, Indiana. The Fosters own the property located at 4938 Euclid Avenue, East Chicago, Indiana and have lived there since they purchased the property in or around 2007. EPA sampled the soil at the Foster's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation. EPA has since taken efforts to remediate the contamination at the Foster's property.

33. Plaintiff William Garcia is a citizen of the State of Indiana and resides in Schererville, Indiana. Mr. Garcia owns the property located at 4747 Drummond Street, East Chicago, Indiana, which he purchased in or around 1992. Mr. Garcia's father currently lives on the property. EPA sampled the soil at Mr. Garcia's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

34. Plaintiff Carmen Garza is a citizen of the State of Indiana and resides in East Chicago, Indiana. Ms. Garza owns the property located at 4927 Euclid Avenue, East Chicago, Indiana, and has lived there since she and her deceased husband purchased the property in or around 1971. EPA sampled the soil at Ms. Garza's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation. EPA has since taken efforts to remediate the contamination at Ms. Garza's property.

35.     Plaintiff Harrison Gibbs is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Gibbs owns the property located at 4819 Ivy Street, East Chicago, Indiana and has lived there since he purchased the property in or around 1979.  EPA sampled the soil at Mr. Gibbs's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Mr. Gibbs's property.

36.     Plaintiff Berteresa Harris is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Harris owns the property located at 4824 Grasselli Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1993.  EPA sampled the soil at Ms. Harris's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

37.     Plaintiff Terrance Hill is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Terrence and Nettie Hill own the property located at 434 Vernon Avenue, East Chicago, Indiana, where Mr. Terrance Hill grew up and currently resides.  Nettie Hill's mother purchased the property located at 434 Vernon Avenue in or around 1961 and transferred interest to Nettie in or around 1993.  Mr. Terrence Hill acquired his interest in the property in or around 2015.  EPA sampled the soil at the Hill's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.  EPA has taken efforts to remediate the contamination at the Hill's property.

38.     Plaintiffs Curtis and Nettie Hill are citizens of the State of Indiana and reside in East Chicago, Indiana.  Curtis and Nettie Hill own the property located at 402 Vernon Avenue, East Chicago, Indiana and have lived there since they purchased the property in or around 1983.

EPA sampled the soil at the Hill's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

39.     Plaintiffs Sara and Mauro Jimenez are citizens of the State of Indiana and reside in Crown Point, Indiana.  The Jimenezes own the property located at 4917 Euclid Avenue, East Chicago, Indiana, which they purchased in or around 1999.  EPA sampled the soil at the Jimenez's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at the Jimenez's property.  The Jimenezes lived at their property until 2017, when they moved because of Defendants' contamination.

40.     Plaintiff Emma Johnson is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Johnson owns the property located at 419 Vernon Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 2004.  EPA sampled the soil at Ms. Johnson's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

41.     Plaintiff Frank Kresich is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Kresich owns the property located at 4719 Euclid Avenue, East Chicago, Indiana and has lived there since he purchased the property in or around 1955.

42.     Plaintiff Chinita Lindsay is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Lindsay owns the property located at 4914 Drummond Street, East Chicago, Indiana, where she has resided since she purchased the property in or around 1991. EPA sampled the soil at Ms. Lindsay's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has taken efforts to remediate the contamination at Ms. Lindsay's property.

43.     Plaintiff Lori Locklear is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Locklear owns the property located at 4717 Ivy Street, East Chicago, Indiana and has lived there since she purchased the property in or around 2006.  EPA sampled the soil at Ms. Locklear's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has taken efforts to remediate the contamination at Ms. Locklear's property.

44.     Plaintiff Maritza Lopez is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Lopez owns the property located at 4928 Euclid Avenue, East Chicago, Indiana, where she has lived since she was 6 months old.  Ms. Lopez's parents purchased the property in or around 1974 and transferred interest to Ms. Lopez in or around 1998.  EPA sampled the soil at Ms. Lopez's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has taken efforts to remediate the contamination at Ms. Lopez's property.

45.     Plaintiff William Luckett is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Luckett has an interest in the property located at 4939 Melville Avenue, East Chicago, Indiana, which his father purchased in or around 1953 and where he currently resides.  EPA sampled the soil at Mr. Luckett's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Mr. Luckett's property.

46.     Plaintiff Angela McFerrin is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. McFerrin owns the property located at 4810 Carey Street, East Chicago, Indiana, where she has lived since in or around 1997 and purchased in or around 1998.  Ms. McFerrin also has a rental unit on her property.  EPA sampled the soil at Ms. McFerrin's

property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

47.     Plaintiff Margo Morris is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Morris owns the properties located at 4746 Melville Avenue and 4748 Melville Avenue, East Chicago, Indiana.   Ms. Morris has lived at 4748 Melville since she purchased the property in or around 2001.  Ms. Morris rents out her property at 4746 Melville Avenue.  EPA sampled the soil at Ms. Morris's properties and determined that the levels of lead and/or arsenic at both properties pose serious health risks and warrant timely remediation.

48.     Plaintiff Donald Mosley is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Donald Mosley owns the property located at 4804 McCook Avenue, East Chicago, Indiana, where he has lived since purchasing the property in 1963.  EPA sampled the soil at Mr. Donald Mosley's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.

49.     Plaintiff Raymond Mosley is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Raymond Mosley owns the property located at 4921 Euclid Avenue, East Chicago, Indiana and has lived there since he purchased the property in or around 1990.  EPA sampled the soil at Mr. Raymond Mosley's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Mr. Raymond Mosley's property.

50.     Plaintiff Sandra Muniz-Garza is a citizen of the State of Florida and resides in Hollywood, Florida.  Ms. Muniz-Garza owns the property located at 4820 Carey Street, East Chicago, Indiana, which her parents purchased in or around 1978 and subsequently transferred their interest to Ms. Muniz-Garza.  EPA sampled the soil at Ms. Muniz-Garza's property and

-13-

determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Muniz-Garza's property.

51.     Plaintiff Melissa Peterson is a citizen of the State of Indiana and resides in East Chicago, Indiana.   Ms. Peterson owns the property located at 4912 Melville Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1998.  EPA sampled the soil at Ms. Peterson's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

52.     Plaintiff Natalie Robinson is a citizen of the State of Indiana and resides in East Chicago, Indiana.   Ms. Robinson owns the property located at 4913 Euclid Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1999.  EPA sampled the soil at Ms. Robinson's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Robinson's property.

53.     Plaintiffs Jose and Natalia Sanchez are citizens of the State of Indiana and reside in East Chicago, Indiana.  The Sanchezes own the property located at 4806 Grasselli Street, East Chicago, Indiana and have lived there since they purchased the property in or around 1970. EPA sampled the soil at the Sanchez's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

54.     Plaintiff Madeleine A.P. Spann is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Spann owns the property located at 4942 Euclid Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1982.  EPA sampled the soil at Ms. Spann's property and determined that the levels of lead and/or arsenic at

her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Spann's property.

55.     Plaintiffs John and Delphine Sullivan are citizens of the State of Indiana and reside in East Chicago, Indiana.  The Sullivans own the property located at 5015 Melville Avenue, East Chicago, Indiana and have lived there since they purchased the property in or around 1971.  EPA sampled the soil at the Sullivan's property and determined that the levels of lead and/or arsenic at their property pose serious health risks and warrant timely remediation.

56.     Plaintiffs Micheal Trambles and Chanthini Fowler are citizens of the State of Indiana and reside in East Chicago, Indiana.  The Trambles own the property located at 4910 Euclid Avenue, East Chicago, Indiana and have lived there since they purchased the property in or around 2007.

57.     Plaintiff Bernice Victor is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Victor owns the property located at 4918 Euclid Avenue, East Chicago, Indiana and has lived there since she and her deceased husband purchased the property in or around June of 1965.  EPA sampled the soil at Ms. Victor's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Victor's property.

58.     Plaintiff Dwayne Washington is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Dwayne Washington owns the properties located at 412 Vernon Avenue and 4936 Carey Street, East Chicago, Indiana.  Mr. Dwayne Washington purchased the 412 Vernon Avenue property in or around 1970, and the 4936 Carey Street property in or around 1996.  EPA sampled the soil at Mr. Dwayne Washington's property located at 412 Vernon

Avenue and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.

59.     Plaintiff Isaac Washington is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Mr. Isaac Washington owns the property located at 450 Vernon Avenue, East Chicago, Indiana, which he purchased in or around 1993.  Mr. Isaac Washington currently rents out his property.  EPA sampled the soil at Mr. Isaac Washington's property and determined that the levels of lead and/or arsenic at his property pose serious health risks and warrant timely remediation.

60.     Plaintiff Jacqueline Washington-Brown is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Washington-Brown owns the property located at 414 Vernon Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1998.  EPA sampled the soil at Ms. Washington-Brown's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Washington-Brown's property.

61.     Plaintiff Sarah Willis is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Willis owns the property located at 4943 Melville Avenue, East Chicago, Indiana and has lived there since she purchased the property in or around 1990.  EPA sampled the soil at Ms. Willis's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.

62.     Plaintiff Betty Zic is a citizen of the State of Indiana and resides in East Chicago, Indiana.  Ms. Zic owns the property located at 4715 Ivy Street, East Chicago, Indiana and has lived there since she purchased the property in or around 1953.  EPA sampled the soil at Ms.

Zic's property and determined that the levels of lead and/or arsenic at her property pose serious health risks and warrant timely remediation.  EPA has since taken efforts to remediate the contamination at Ms. Zic's property.

## III.   JURISDICTION AND VENUE

63.   This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because this is a matter between citizens of different states, and the amount in controversy exceeds $75,000 per Plaintiff.

64.   Plaintiffs Cristobal and Theresa Alvarez seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they experienced during remediation of their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

65.   Plaintiff Cytheria Artis seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use,

development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

66.     Plaintiff Pamela Berry seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of the area surrounding her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination to her neighborhood; damages for the annoyance she has experienced due to remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

67.     Plaintiff William Boleware seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he experienced during remediation of his property; damages for the annoyance he has experienced due to the

remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

68.    Plaintiff Earlie Braden seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

69.    Plaintiff Annie Brooks seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive

damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

70.     Plaintiffs Devin L. and Linda Crymes seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they have experienced due to the need to remediate their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

71.     Plaintiffs Ezell and Alice Foster seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they have experienced due to the need to remediate their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and

punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

72.     Plaintiff William Garcia seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination of his property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he has experienced due to the need to remediate his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

73.     Plaintiff Carmen Garza seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to

deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

74.     Plaintiff Harrison Gibbs seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he experienced during remediation of his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

75.     Plaintiff Berteresa Harris seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

76.     Plaintiff Terence Hill seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he has experienced during remediation of his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

77.     Plaintiffs Curtis and Nettie Hill seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they have experienced due to the need to remediate their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

78.     Plaintiffs Sara and Mauro Jimenez seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they experienced during remediation of their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

79.     Plaintiff Emma Johnson seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

80.     Plaintiff Frank Kresich seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination of the area surrounding his property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination to his neighborhood; damages for the annoyance he has experienced due to remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

81.     Plaintiff Chinita Lindsay seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

82.     Plaintiff Lori Locklear seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting

from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

83.     Plaintiff Maritza Lopez seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

84.     Plaintiff William Luckett seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination of his property; costs for the remediation of other contaminants

not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he has experienced due to the need to remediate his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

85.     Plaintiff  Angela McFerrin seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

86.     Plaintiff Margo Morris seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her properties resulting from Defendants' contamination of her properties; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for

the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her properties since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her properties; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

87.     Plaintiff Donald Mosley seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination of his property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he has experienced due to the need to remediate his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

88.     Plaintiff Raymond Mosley seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment

of his property since he learned of the contamination; damages for the annoyance he experienced during remediation of his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

89.   Plaintiff Sandra Muniz-Garza seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

90.   Plaintiff Melissa Peterson seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the

annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

91.     Plaintiff Natalie Robinson seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

92.     Plaintiffs Jose and Natalia Sanchez seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they have experienced due to the need to remediate their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties;

damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

93.    Plaintiff Madeleine A.P. Spann seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

94.    Plaintiffs John and Delphine Sullivan seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination; damages for the annoyance they have experienced due to the need to remediate their property; damages for the annoyance they have experienced due to the remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and

punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

95.     Plaintiffs Micheal Trambles and Chanthini Fowler seek compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of their property resulting from Defendants' contamination of the area surrounding their property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of their groundwater; damages for the interference with the reasonable use, development, and enjoyment of their property since they learned of the contamination to their neighborhood; damages for the annoyance they have experienced due to remediation of their neighbors' properties; damages for the emotional distress they have suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

96.     Plaintiff Bernice Victor seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to

deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

97.     Plaintiff Dwayne Washington seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his properties resulting from Defendants' contamination of his properties; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his properties since he learned of the contamination; damages for the annoyance he has experienced due to the need to remediate his property located at 412 Vernon Street; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

98.     Plaintiff Isaac Washington seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of his property resulting from Defendants' contamination of his property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of his groundwater; damages for the interference with the reasonable use, development, and enjoyment of his property since he learned of the contamination; damages for the annoyance he has experienced due to the need to remediate his property; damages for the annoyance he has experienced due to the remediation of his neighbors' properties; damages for the emotional distress he has suffered since learning of the contamination; and punitive damages

-33-

in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

99.     Plaintiff Jacqueline Washington-Brown seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

100.     Plaintiff Sarah Willis seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination of her property; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced due to the need to remediate her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive

damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

101.    Plaintiff Betty Zic seeks compensatory and punitive damages exceeding $75,000, including but not limited to:  the diminution in market value of her property resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of her groundwater; damages for the interference with the reasonable use, development, and enjoyment of her property since she learned of the contamination; damages for the annoyance she has experienced during remediation of her property; damages for the annoyance she has experienced due to the remediation of her neighbors' properties; damages for the emotional distress she has suffered since learning of the contamination; and punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner.

102.    All of the relevant acts and/or omissions set forth in this Complaint took place in Lake County, Indiana.

103.    Venue is proper in the Northern District of Indiana pursuant to 28 U.S.C. § 1391 because all the events giving rise to Plaintiffs' claims occurred in this District.

## IV.    DEFENDANTS' WRONGFUL CONDUCT

### A.    Defendants Contaminate Plaintiffs' Homes by Releasing Hazardous Lead, Arsenic, PAHs, and Other Contaminants From Their Facilities

104.    ARCO owned and operated white lead and zinc oxide manufacturing and metal refining facilities at 151st and McCook Avenue in East Chicago, Indiana, until in or around 1972.

105.    ARCO's operations included a pulverizing mill, white-lead storage areas, a chemical laboratory, a machine shop, a zinc oxide experimental unit building and plant, a silver refinery, a lead refinery, and a baghouse.  During plant operations, ARCO's facility generated airborne emissions of contaminants from plant stacks and also leaked and/or spilled contaminants, including lead, arsenic, and PAHs, into the surrounding area, contaminating Plaintiffs' groundwater and properties.  ARCO's facility also contaminated the fill material used to raise the ground level at or nearby Plaintiffs' properties with lead, arsenic, PAHs, and other contaminants.

106.    Therefore, at and from its facility, ARCO released or caused to be released lead, arsenic, PAHs, and other hazardous contaminants that were aerially deposited, directly released, and/or migrated onto or near Plaintiffs' properties, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

107.    DuPont owns the property at 5215 Kennedy Avenue, where its former facility processed a significant quantity of metals and other chemicals from approximately 1893 through 2000.  At its facility, DuPont also manufactured pesticide lead arsenate from 1910 to 1949. During plant operations, DuPont's facility generated airborne emissions of contaminants, including lead, arsenic, and PAHs, from plant stacks and also leaked and/or spilled contaminants into the surrounding area, contaminating Plaintiffs' groundwater and properties.  DuPont's facility also contaminated the fill material used to raise the ground level at or nearby Plaintiffs' properties with lead, arsenic, PAHs, and other contaminants.

108.    Even after operations at the DuPont facility ceased, arsenic-contaminated groundwater continues to migrate from DuPont's property to the surrounding area, including Plaintiffs' properties.  After operations ceased, DuPont continued, and to this day continues, to

fail to control hazardous substances on its property, including but not limited to arsenic, cadmium, lead, and zinc which leak and/or spill into the surrounding area, including Plaintiffs' properties.

109.    Therefore, at and from its facility, DuPont released or caused to be released lead, arsenic, and other contaminants that were aerially deposited, directly released, and/or migrated onto or near Plaintiffs' properties, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

110.    U.S.S. Lead owned and operated lead refining and secondary lead smelting facilities at 5300 Kennedy Avenue in East Chicago, Indiana, from approximately 1906 to 1985. At its facilities, U.S.S. Lead refined significant quantities of lead and other metals and chemicals, including arsenic.   U.S.S. Lead's facilities generated airborne emissions of contaminants, including lead, arsenic, and PAHs, from plant stacks into the surrounding area, contaminating Plaintiffs' properties.   South of its plant building, U.S.S. Lead also stockpiled waste containing hazardous contaminants from its blast-furnace and, once a year, spread the waste over an adjoining 21 acres of wetlands, which leaked and/or spilled contaminants into the surrounding area, contaminating Plaintiffs' groundwater and properties.

111.    Therefore, at and from its facilities, U.S.S. Lead released or caused to be released lead, arsenic, and other contaminants that were aerially deposited, directly released, and/or migrated onto or near Plaintiffs' properties, contaminating the soil, groundwater, and/or interiors of Plaintiffs' homes.

112.    U.S.S. Lead is a wholly owned subsidiary of MRRC.  MRRC is a wholly owned subsidiary of Arava.  Arava is a wholly owned subsidiary of Mueller.

113.    According to Mueller's 2017 10-Q filing with the SEC, Mueller, Arava, and MRRC each received general notice letters from EPA asserting that they may be Potentially Responsible Parties ("PRPs") in connection with the U.S.S. Lead Superfund Site.

114.    Under CERCLA, a PRP is any individual or organization potentially responsible for, or contributing to, a spill or other contamination at a Superfund site.  Parent companies may be held responsible for the acts of their subsidiaries under CERCLA when either (1) a basis exists for "piercing the veil" under traditional corporate law principles; or (2) when the parent company actually manages, directs, or conducts operations specifically related to pollution—i.e., operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

115.    On September 20, 2017, EPA and U.S.S. Lead, MRRC, Arava, and Mueller entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study of Operable Unit 2 of the U.S. Smelter and Lead Refinery, Inc. Superfund Site ("Administrative Settlement"), under which U.S.S. Lead agreed to conduct a remedial investigation of the groundwater at the Superfund Site and the soil in the area where its former facilities operated at 5300 Kennedy Avenue in East Chicago, Indiana.

116.    Under the Administrative Settlement, Mueller agreed to guarantee financial assurance for U.S.S. Lead's CERCLA liability in connection to the Superfund Site.

117.    Throughout their operations and continuing to the present day, Defendants failed to notify residents and property owners, including Plaintiffs, of the contamination and potential adverse health effects associated with exposure to discharges of lead, arsenic, and other hazardous contaminants from Defendants' facilities, and instead kept the existence of the contamination secret from Plaintiffs.

**B.      Plaintiffs Learn Decades Later That They Have Been Living On and/or Near Contaminated Land**

118.   Because of the hazardous contaminants Defendants caused to be released into the area surrounding Plaintiffs' homes, EPA placed the area where Plaintiffs own property on the Superfund's National Priorities List in 2009.  Doing so triggered EPA's duty to investigate, select, and execute a remediation plan under CERCLA, 42 U.S.C. § 9601.  In November 2012, EPA finally outlined a plan to test and remediate the contaminated properties.

119.   After two years of negotiating with ARCO and DuPont, during which time little testing and no remediation occurred, EPA filed a CERCLA contribution action against those Defendants on September 3, 2014, and simultaneously filed a Consent Decree implementing EPA and Defendants' pre-negotiated plan to remediate the Superfund Site.  Under the Consent Decree, EPA is solely responsible for performing soil sampling and remediation at the Superfund Site.  Defendants contributed funds to the remediation but otherwise have no involvement.

120.   Under the remediation plan, EPA performed soil sampling for lead and arsenic on Plaintiffs' real properties.

121.   EPA remediates properties where the results of soil sampling show lead levels above 400 mg/kg and/or arsenic levels above 26 mg/kg.  According to EPA, lead levels above 400 mg/kg and arsenic levels above 26 mg/kg pose serious health risks and warrant timely response actions.

122.   According to EPA, lead levels above 1,200 mg/kg and arsenic levels above 68 mg/kg pose an imminent and substantial threat to human health and warrant emergency remediation.

123.   Neither EPA nor Defendants informed Plaintiffs of the results of EPA's soil testing until on or after September 14, 2016.

124.     Most residents of the Superfund Site, including Plaintiffs, did not even know that they were living on toxic contamination until on or around July 27, 2016, when the City of East Chicago announced that it planned on closing and demolishing a public housing complex located on the Superfund Site because EPA testing revealed extremely high levels of lead and arsenic in the soil at the public housing complex.  The City informed residents of that complex that, for their own safety, they had to move within 30 to 60 days.

125.     For months after residents who owned homes on the Superfund Site, including Plaintiffs, first learned of the contamination, EPA only haphazardly provided Plaintiffs with information regarding the contamination and the risks it poses to their health and properties, even though Plaintiffs lived in close proximity to—several just across the street from—the public housing complex.

126.     Plaintiffs Cristobal and Theresa Alvarez received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Alvarezes did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA took efforts to remediate the Alvarez's property in or around October 2016.  The Alvarezes have not yet received results of testing for indoor contamination.

127.     Plaintiff Cytheria Artis received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Artis did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has not yet tested Ms. Artis's home for indoor contamination.  EPA has informed Ms. Artis that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.

128.     Plaintiff Pamela Berry received a letter from EPA on or after September 14, 2016 stating that lead and/or arsenic was present on her property, but below the concentration required for EPA to remediate the property.

129.     Plaintiff William Boleware received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Boleware did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA took efforts to remediate Mr. Boleware's property on or around July 28, 2017.  Mr. Boleware has  not yet received results of testing for indoor contamination.

130.     Plaintiff Earlie Braden received a letter from EPA on or around April 29, 2010 stating that lead levels at her property exceeded 1,200 mg/kg.  EPA conducted an emergency remediation of Ms. Braden's property in or around 2010.  Ms. Braden received another letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg.  Before receiving this letter, Ms. Braden did not know and had no reason to know or suspect that her property was again contaminated by Defendants.  EPA has informed Ms. Braden that it will take efforts to remediate her property again in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Braden's home for indoor contamination.

131.     Plaintiff Annie Brooks received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Brooks did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has informed Ms. Brooks that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Brooks' home for indoor contamination.

132.    Plaintiffs Devin L. and Linda Crymes received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Crymeses did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA has informed the Crymeses that it will take efforts to remediate their property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested the Crymes' home for indoor contamination.

133.    Plaintiffs Ezell and Alice Foster received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Fosters did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA took efforts to remediate the Foster's property on or around September 2017.  EPA tested the interior of the Foster's home for contamination but has not yet informed them of the results.

134.    Plaintiff William Garcia received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Garcia did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA has informed Mr. Garcia that it will take efforts to remediate his property 2018, but EPA has not yet set a date for remediation. EPA has not yet tested Mr. Garcia's home for indoor contamination.

135.    Plaintiff Carmen Garza received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 1,200 mg/kg and arsenic levels exceeded 68 mg/kg.  Before receiving this letter, Ms. Garza did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA also informed Ms. Garza that

-42-

her home tested positive for indoor contamination.  EPA took efforts to remediate Ms. Garza's property, including the inside of Ms. Garza's home, on or around October 26, 2016.

136.    Plaintiff Harrison Gibbs received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Gibbs did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA took efforts to remediate Mr. Gibbs's property on or around September 22, 2017.  EPA tested Mr. Gibbs's home for indoor contamination, but Mr. Gibbs has not yet received the results.

137.    Plaintiff Berteresa Harris received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Harris did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has informed Ms. Harris that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Harris's home for indoor contamination.

138.    Plaintiff Terrance Hill received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Terrance Hill did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA also informed Mr. Terrance Hill that the inside of his home tested positive for contamination.  EPA took efforts to remediate his property, including the inside of his home, in or around September 2017.

139.    Plaintiffs Curtis and Nettie Hill received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Hills did not know and had no reason to

know or suspect that their property was contaminated by Defendants.  EPA has informed the Hills that it will take efforts to remediate their property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested the Hill's home for indoor contamination.

140.    Plaintiffs Sara and Mauro Jimenez received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 1,200 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Jimenezes did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA also informed the Jimenezes that the inside of their home tested positive for contamination.  EPA took efforts to remediate their property, including the inside of their home, in or around May 2017.

141.    Plaintiff Emma Johnson received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Johnson did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has informed Ms. Johnson that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Johnson's home for indoor contamination.

142.    Plaintiff Frank Kresich received a letter from EPA on or after September 14, 2016 stating that lead and/or arsenic was present on his property, but below the concentration required for EPA to remediate the property.

143.    Plaintiff Chinita Lindsay received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Lindsay did not know and had no reason to know or

suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Lindsay's property in or around August 2017.

144.     Plaintiff Lori Locklear received an email from EPA on or around September 8, 2016 and a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Locklear did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Locklear's property in or around July 2017.  EPA also informed Ms. Locklear that her home tested positive for indoor contamination in or around August 2017.  EPA took efforts to remediate the interior of Ms. Locklear's home in or around October 2017.

145.     Plaintiff  Maritza Lopez received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Lopez did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Lopez's property, including the inside of Ms. Lopez's home, in or around May 2017.  EPA also informed Ms. Lopez in or around June 2017 that her home tested positive for indoor contamination.  EPA took efforts to remediate the interior of Ms. Locklear's home after August 2017.

146.     Plaintiff William Luckett's father received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Luckett and his father did not know and had no reason to know or suspect that his father's property was contaminated by Defendants. EPA took efforts to remediate the property in or around August 2017.

-45-

147.    Plaintiff Angela McFerrin received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. McFerrin did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has informed Ms. McFerrin that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. McFerrin's home for indoor contamination.

148.    Plaintiff Margo Morris received two letters from EPA on or after September 14, 2016 stating that lead levels at her properties exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving these letters, Ms. Morris did not know and had no reason to know or suspect that her properties were contaminated by Defendants.  EPA has informed Ms. Morris that it will take efforts to remediate her properties in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Morris's properties for indoor contamination.

149.    Plaintiff Donald Mosley received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Donald Mosley did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA has informed Mr. Donald Mosley that it will take efforts to remediate his property in 2018, but EPA has not yet set a date for remediation.   EPA has not yet tested Mr. Donald Mosley's home for indoor contamination.

150.    Plaintiff Raymond Mosley received a letter from EPA on or around April 29, 2010 stating that lead levels at his property exceeded 1,200 mg/kg.  EPA conducted an emergency remediation of Mr. Raymond Mosley's property in or around 2010.  Mr. Raymond Mosley received another letter from EPA on or after September 14, 2016 stating that lead levels

at his property exceeded 400 mg/kg. Before receiving this letter, Mr. Raymond Mosley did not know and had no reason to know or suspect that his property was contaminated again by Defendants. EPA took efforts to remediate Mr. Raymond Mosley's property in or around September 2017. EPA tested the interior of Mr. Raymond Mosley's home for contamination but has not yet informed him of the results.

151. Plaintiff Sandra Muniz-Garza received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg. Before receiving this letter, Ms. Muniz-Garza did not know and had no reason to know or suspect that her property was contaminated by Defendants. EPA took efforts to remediate Ms. Muniz-Garza's property in or around August 2017.

152. Plaintiff Melissa Peterson received a letter from EPA in or around 2012 stating that lead levels at her property exceeded 1,200 mg/kg. Before receiving this letter, Ms. Peterson did not know and had no reason to know or suspect that her property was contaminated by Defendants. EPA conducted an emergency remediation of Ms. Peterson's property in or around 2012. Ms. Peterson received another letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg. EPA has informed Ms. Peterson that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation. EPA has not yet tested Ms. Peterson's home for indoor contamination.

153. Plaintiff Natalie Robinson received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg. Before receiving this letter, Ms. Robinson did not know and had no reason to know or suspect that her property was contaminated by Defendants. EPA took efforts to remediate Ms.

Robinson's property on or around September 6, 2017.  EPA has not yet tested Ms. Robinson's home for indoor contamination.

154.    Plaintiffs Jose and Natalia Sanchez received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Sanchezes did not know and had no reason to know or suspect that their property was contaminated by Defendants. EPA has informed the Sanchezes that it will take efforts to remediate their property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested the Sanchez's home for indoor contamination.

155.    Plaintiff Madeleine A.P. Spann received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Spann did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Spann's property in or around 2016.

156.    Plaintiffs John and Delphine Sullivan received a letter from EPA on or after September 14, 2016 stating that lead levels at their property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, the Sullivans did not know and had no reason to know or suspect that their property was contaminated by Defendants.  EPA has informed the Sullivans that it will take efforts to remediate their property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested the Sullivan's home for indoor contamination.

157.    Plaintiff Bernice Victor received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded

-48-

26 mg/kg.  Before receiving this letter, Ms. Victor did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Victor's property in or around August 2017.  EPA tested the interior of Ms. Victor's home for contamination but has not yet informed her of the results.

158.    Plaintiffs Micheal Trambles and Chanthini Fowler received a letter from EPA on or after September 14, 2016 stating that lead and/or arsenic was present on their property, but below the concentration required for EPA to remediate the property.

159.    Plaintiff Dwayne Washington received a letter from EPA on or after September 14, 2016 stating that lead levels at his property located at 412 Vernon Street exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Dwayne Washington did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA has informed Mr. Dwayne Washington that it will take efforts to remediate his property located at 412 Vernon Street in 2018, but EPA has not yet set a date for remediation. EPA has not yet tested his property at 412 Vernon Street for indoor contamination.

160.    Plaintiff Dwayne Washington received a letter from EPA on or after September 14, 2016 stating that lead and/or arsenic was present on his property located at 4936 Carey Street, but below the concentration required for EPA to remediate the property.

161.    Plaintiff Isaac Washington received a letter from EPA on or after September 14, 2016 stating that lead levels at his property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Mr. Isaac Washington did not know and had no reason to know or suspect that his property was contaminated by Defendants.  EPA has informed Mr. Isaac Washington that it will take efforts to remediate his property in 2018, but EPA has not yet set a date for remediation.

162.    Plaintiff Jacqueline Washington-Brown received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Washington-Brown did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Washington-Brown's property in or around April 2017.

163.    Plaintiff Sarah Willis received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Willis did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA has informed Ms. Willis that it will take efforts to remediate her property in 2018, but EPA has not yet set a date for remediation.  EPA has not yet tested Ms. Willis's home for indoor contamination.

164.    Plaintiff Betty Zic received a letter from EPA on or after September 14, 2016 stating that lead levels at her property exceeded 400 mg/kg and/or arsenic levels exceeded 26 mg/kg.  Before receiving this letter, Ms. Zic did not know and had no reason to know or suspect that her property was contaminated by Defendants.  EPA took efforts to remediate Ms. Zic's property in or around December 2016.

165.    EPA has not performed soil sampling for PAHs or other hazardous contaminants Defendants caused to be released from their facilities.

166.    EPA did not perform sampling for groundwater contamination, despite evidence that the hazardous contaminants Defendants caused to be released from their facilities continues to contaminate the groundwater at Plaintiffs' properties.

**C.     The Contamination Has Traumatized Plaintiffs and Thrown Their Lives into Disarray**

167.    Plaintiffs have been living on or near the contamination caused by Defendants for decades, with no knowledge that they and their families were at severe health risk.  Defendants never notified Plaintiffs that they caused discharges of hazardous contaminants, including lead, arsenic, and PAHs onto Plaintiffs' properties and groundwater, and Defendants never warned Plaintiffs about the potential adverse health effects associated with exposure to such discharges. To this day, Defendants' discharges continue to cause contaminated groundwater to seep into Plaintiffs' basements and drainage systems, and contaminated dust and soil to actively enter Plaintiffs' homes.  Because of Defendants' contamination, Plaintiffs' property values have sharply decreased, Plaintiffs cannot sell or rent their homes, and Plaintiffs have experienced extreme stress and anxiety.

**i.     As a result of Defendants' contamination, Plaintiffs' property values have plummeted**

168.    After Defendants' contamination was made public, the value of each Plaintiff's property has declined and continues to decline.

169.    Because of Defendants' contamination, the assessed value of each Plaintiff's property has drastically declined from 2015 to the present, and the Third District County Commissioner, Michael C. Repay, has informed each Plaintiff that the assessed value of their home will be reduced by another 15–25% on their next tax bill.

170.    In 2015, the assessed value of Plaintiffs Cristobal and Theresa Alvarez's property for tax purposes was $54,000.  The most recent 2017 assessment of the Alvarez's property for tax purposes was $48,500.  The assessed value will be reduced by another 15% on their next tax bill.

171.    In 2015, the assessed value of Plaintiff Cytheria Artis's property for tax purposes was $43,400.  The most recent 2017 assessment of Ms. Artis's property for tax purposes was $29,200.  The assessed value will be reduced by another 15% on her next tax bill.

172.    In 2015, the assessed value of Plaintiff Pamela Berry's property for tax purposes was $66,500.  The most recent 2017 assessment of Ms. Berry's property for tax purposes was $59,200.  The assessed value will be reduced by another 15% on her next tax bill.

173.    In 2015, the assessed value of Plaintiff William Boleware's property for tax purposes was $43,700.  The most recent 2017 assessment of Mr. Boleware's property for tax purposes was $40,300.  The assessed value will be reduced by another 25% on his next tax bill.

174.    In 2015, the assessed value of Plaintiff Earlie Braden's property for tax purposes was $51,000.  The most recent 2017 assessment of Ms. Braden's property for tax purposes was $34,200.  The assessed value will be reduced by another 25% on her next tax bill.

175.    In 2015, the assessed value of Plaintiff Annie Brooks's property for tax purposes was $46,300.  The most recent 2017 assessment of Ms. Brooks's property for tax purposes was $30,000.  The assessed value will be reduced by another 25% on her next tax bill.

176.    In 2015, the assessed value of Plaintiffs Devin L. and Linda Crymes's property for tax purposes was $82,600.  The most recent 2017 assessment of the Crymes's property for tax purposes was $54,500.  The assessed value will be reduced by another 25% on their next tax bill.

177.    In 2015, the assessed value of Plaintiffs Ezell and Alice Foster's property for tax purposes was $56,400.  The most recent 2017 assessment of the Foster's property for tax purposes was $50,500.  The assessed value will be reduced by another 15% on their next tax bill.

178.    In 2015, the assessed value of Plaintiff William Garcia's property for tax purposes was $30,200.  The most recent 2017 assessment of Mr. Garcia's property for tax purposes was $26,200.  The assessed value will be reduced by another 15% on his next tax bill.

179.    In 2015, the assessed value of Plaintiff Carmen Garza's property for tax purposes was $45,800.  The most recent 2017 assessment of Ms. Garza's property for tax purposes was $41,500.  The assessed value will be reduced by another 15% on her next tax bill.

180.    In 2015, the assessed value of Plaintiff Harrison Gibbs's property for tax purposes was $52,000.  The most recent 2017 assessment of Mr. Gibbs's property for tax purposes was $46,400.  The assessed value will be reduced by another 15% on his next tax bill.

181.    In 2015, the assessed value of Plaintiff Berteresa Harris's property for tax purposes was $46,000.  The most recent 2017 assessment of Ms. Harris's property for tax purposes was $42,500.  The assessed value will be reduced by another 15% on her next tax bill.

182.    In 2015, the assessed value of Plaintiff Terrance Hill's property for tax purposes was $47,300.  The most recent 2017 assessment of Mr. Terrance Hill's property for tax purposes was $31,700.  The assessed value will be reduced by another 25% on his next tax bill.

183.    In 2015, the assessed value of Plaintiffs Curtis and Nettie Hill's property for tax purposes was $66,700.  The most recent 2017 assessment of the Hill's property for tax purposes was $42,700.  The assessed value will be reduced by another 25% on their next tax bill.

184.    In 2015, the assessed value of Plaintiffs Sara and Mauro Jimenez's property for tax purposes was $50,100.  The most recent 2017 assessment of the Jimenez's property for tax purposes was $45,300.  The assessed value will be reduced by another 15% on their next tax bill.

185.    In 2015, the assessed value of Plaintiff Emma Johnson's property for tax purposes was $37,600.  The most recent 2017 assessment of Ms. Johnson's property for tax purposes was $25,000.  The assessed value will be reduced by another 25% on her next tax bill.

186.    In 2015, the assessed value of Frank Kresich's property for tax purposes was $42,200.   The most recent 2017 assessment of Mr. Kresich's property for tax purposes was $37,700.  The assessed value will be reduced by another 15% on his next tax bill.

187.    In 2015, the assessed value of Plaintiff Chinita Lindsay's property for tax purposes was $46,100.  The most recent 2017 assessment of Ms. Lindsay's property for tax purposes was $43,900.  The assessed value will be reduced by another 15% on her next tax bill.

188.    In 2015, the assessed value of Plaintiff Lori Locklear's property for tax purposes was $53,000.  The most recent 2017 assessment of Ms. Locklear's property for tax purposes was $47,100.  The assessed value will be reduced by another 15% on her next tax bill.

189.    In 2015, the assessed value of Plaintiff Maritza Lopez's property for tax purposes was $75,200.  The most recent 2017 assessment of Ms. Lopez's property for tax purposes was $66,700.  The assessed value will be reduced by another 15% on her next tax bill.

190.    In 2015, the assessed value of Plaintiff William Luckett's property for tax purposes was $43,000.   The most recent 2017 assessment of Mr. Luckett's property for tax purposes was $28,900.  The assessed value will be reduced by another 25% on his next tax bill.

191.    In 2015, the assessed value of Plaintiff Angela McFerrin's property for tax purposes was $33,500.   The most recent 2017 assessment of Ms. McFerrin's property for tax purposes was $30,900.  The assessed value will be reduced by another 15% on her next tax bill.

192.    In 2015, the assessed value of Plaintiff Margo Morris's 4746 Melville Avenue property for tax purposes was $50,300, and the 4748 Melville Avenue property for tax purposes

was $67,700.  The most recent 2017 assessment of Ms. Morris's 4746 Melville Avenue property for tax purposes was $34,000, and the 4748 Melville Avenue property for tax purposes was $44,100.  The assessed value of each property will be reduced by another 15% on her next tax bills.

193.    In 2015, the assessed value of Plaintiff Donald Mosley's property for tax purposes was $39,100.   The most recent 2017 assessment of Mr. Donald Mosley's property for tax purposes was $24,900.  The assessed value will be reduced by another 25% on his next tax bill.

194.    In 2015, the assessed value of Plaintiff Raymond Mosley's property for tax purposes was $40,500.  The most recent 2017 assessment of Mr. Raymond Mosley's property for tax purposes was $35,900.  The assessed value will be reduced by another 15% on his next tax bill.

195.    In 2015, the assessed value of Plaintiff Sandra Muniz-Garza's property for tax purposes was $46,400.  The most recent 2017 assessment of Ms. Muniz-Garza's property for tax purposes was $43,000.  The assessed value will be reduced by another 15% on her next tax bill.

196.    In 2015, the assessed value of Plaintiff Melissa Peterson's property for tax purposes was $42,700.  The most recent 2017 assessment of Ms. Peterson's property for tax purposes was $28,700.  The assessed value will be reduced by another 25% on her next tax bill.

197.    In 2015, the assessed value of Plaintiff Natalie Robinson's property for tax purposes was $36,000.  The most recent 2017 assessment of Ms. Robinson's property for tax purposes was $33,100.  The assessed value will be reduced by another 15% on her next tax bill.

198.    In 2015, the assessed value of Plaintiffs Jose and Natalia Sanchez's property for tax purposes was $32,600.  The most recent 2017 assessment of the Sanchez's property for tax purposes was $30,200.  The assessed value will be reduced by another 15% on their next tax bill.

199.    In 2015, the assessed value of Plaintiff Madeleine A.P. Spann's property for tax purposes was $63,300.   The most recent 2017 assessment of Ms. Spann's property for tax purposes was $56,800.  The assessed value will be reduced by another 15% on her next tax bill.

200.    In 2015, the assessed value of Plaintiffs John and Delphine Sullivan's property for tax purposes was $57,900.   The most recent 2017 assessment of the Sullivan's property for tax purposes was $39,500.  The assessed value will be reduced by another 25% on their next tax bill.

201.    In 2015, the assessed value of Plaintiffs Micheal Trambles's and Chanthini Fowler's property for tax purposes was $45,200.  The most recent 2017 assessment of Plaintiffs Trambles's and Fowler's property for tax purposes was $41,600.  The assessed value will be reduced by another 15% on their next tax bill.

202.    In 2015, the assessed value of Plaintiff Bernice Victor's property for tax purposes was $42,100.  The most recent 2017 assessment of Ms. Victor's property for tax purposes was $38,600.  The assessed value will be reduced by another 15% on her next tax bill.

203.    In 2015, the assessed value of Plaintiff Dwayne Washington's 412 Vernon Avenue property for tax purposes was $46,000, and the 4936 Carey Street property for tax purposes was $64,000.   The most recent 2017 assessment of Mr. Dwayne Washington's 412 Vernon Avenue property for tax purposes was $29,400, and the 4936 Carey Street property for tax purposes was $59,700.  The assessed value of Mr. Dwayne Washington's 412 Vernon Avenue property will be reduced by another 25% on his next tax bill, and the assessed value of Mr. Dwayne Washington's 4936 Carey Street property will be reduced by another 15% on his next tax bill.

204.    In 2015, the assessed value of Plaintiff Isaac Washington's property for tax purposes was $32,000.  The most recent 2017 assessment of Mr. Isaac Washington's property for

tax purposes was $20,300.  The assessed value will be reduced by another 25% on his next tax bill.

205.     In 2015, the assessed value of Plaintiff Jacqueline Washington-Brown's property for tax purposes was $35,800.  The most recent 2017 assessment of Ms. Washington-Brown's property for tax purposes was $23,500.  The assessed value will be reduced by another 25% on her next tax bill.

206.     In 2015, the assessed value of Plaintiff Sarah Willis's property for tax purposes was $43,500.  The most recent 2017 assessment of Ms. Willis's property for tax purposes was $28,200.  The assessed value will be reduced by another 25% on her next tax bill.

207.     In 2015, the assessed value of Plaintiff Betty Zic's property for tax purposes was $52,100.  The most recent 2017 assessment of Ms. Zic's property for tax purposes was $46,200. The assessed value will be reduced by another 15% on her next tax bill.

208.     The actual diminution in assessed value of Plaintiffs' properties is due to Defendants' contamination.    The most recent 2017 assessed values of properties located in the neighborhood directly to the west of Plaintiffs' properties—and thus located outside of the Superfund site—are higher than the 2015 assessed values for those same properties located outside of the Superfund site.

209.     The decline in true market value of Plaintiffs' properties is even more extreme than the diminution in the value of Plaintiffs' properties assessed for tax purposes.

210.     This decline in market value is a direct result of Defendants' contamination. Absent the contamination, economic forces suggest that home values in this area should be rising.  According to data collected by Zillow.com, the average market value of homes in East Chicago, Indiana has increased by approximately 10.6% in the past year.  The same data shows

that the average market value of homes in East Chicago, Indiana has increased by approximately

17% since the end of 2015.  *See* https://www.zillow.com/home-values/.

> ### ii.     As a result of Defendants' contamination, Plaintiffs cannot sell or rent their homes

211.    Further, potential purchasers of property avoid purchasing land on or near environmental contamination, and potential purchasers of property are well aware that Plaintiffs' properties are located on the Superfund Site.  For the past year, the Superfund Site has been featured prominently in both local and national news.  Further, to sell a home in Indiana, a seller must complete the "Seller's Residential Real Estate Sales Disclosure" and present it to a potential buyer, pursuant to Ind. Code § 32-21-5-2.  The disclosure form mandates disclosure of both current and former "hazardous conditions on the property, such as . . . toxic materials," as well as the disclosure of any "notices by any governmental or quasi-governmental agencies" affecting the property.

212.    In 2015, approximately 17 total residential properties located on the Superfund Site were sold. In 2016, approximately 21 total residential properties located on the Superfund Site were sold.  After news of Defendants' contamination was made public in late 2016, only approximately 6 residential properties located on the Superfund Site have sold in the first nine months of 2017.

213.    Potential buyers who learn about Defendants' contamination are unwilling to purchase Plaintiffs' properties.

214.    For example, before they found out about the contamination, Plaintiffs Sara and Mauro Jimenez were planning on selling their home.  The Jimenezes had secured a buyer through a family contact, agreed on a price between $80,000 and $85,000, and were finalizing

the details.  However, the prospective purchasers had small children and, once they learned of Defendants' contamination of the Jimenez's property, the sale fell through.

215.    Plaintiff Sandra Muniz-Garza also had a private sale fall through after she disclosed Defendants' contamination to the buyers.  Ms. Muniz-Garza then attempted to put her home on the market, but her realtor told her that she could not do so until the property was remediated.  Though  EPA has since taken efforts to remediate the contamination at Ms. Muniz-Garza's property, she has not yet been able to secure a buyer for her property.

216.    Plaintiffs Cristobal and Theresa Alvarez attempted to put their home on the market in or around  July 2017, after EPA undertook efforts to remediate Defendants' contamination at the Alvarez's property.  They first attempted to list their home with a real estate agent, but the agent did not return their calls after learning that the property was located on the Superfund Site.  They then listed the home on Zillow.com themselves.  They have had multiple parties express interest in the home.  However, each party has withdrawn interest after finding out that the Alvarez's home is located on the Superfund Site, even though  EPA has since taken efforts to remediate the contamination at the Alvarez's property.

217.    Even if a Plaintiff were able to secure a potential buyer for his or her property, the market value of each Plaintiff's property has decreased because of Defendants' contamination such that no Plaintiff could sell their home and relocate to any reasonable location.

218.    Because of Defendants' contamination, Plaintiff Angela McFerrin has been unable to secure a renter for the rental unit on her property.

219.    Because  of  Defendants'  contamination,  Plaintiffs  Isaac  Washington, Sandra Muniz-Garza, and Devin L. and Linda Crymes have renters who are moving out of the units they rent from Plaintiffs.

### iii.   Plaintiffs have had to greatly curtail their normal activities as a result of Defendants' contamination of their properties

220.   According to EPA, lead is highly toxic, and exposure to children, especially those age six or younger, is dangerous.  Even low levels of lead in blood are associated with behavioral problems, learning disabilities, and impaired growth.  High levels of lead in blood can cause severe neurological problems such as coma, convulsions, and even death.

221.   To ensure the health and safety of children, the federal Agency for Toxic Substances and Disease Registry (ATSDR) advised residents at the Superfund Site to prevent children from playing on or near contaminated soil.  EPA has also advised residents to keep their windows closed and keep their children inside.

222.   Plaintiffs have thus stopped letting their children and grandchildren play outside, and they have limited visits from their grandchildren, for fear that the contamination will affect the children's health and development.

223.   Further, at EPA's direction, Plaintiffs with indoor contamination have had to avoid certain rooms or floors of their homes due to indoor contamination.  In order for EPA to remediate indoor contamination, homeowners, including Plaintiffs, must pack and move their belongings.  EPA only cleans hard surfaces inside contaminated homes; it is the homeowner's responsibility to clean and/or replace furniture, other upholstered material, and window dressings.  Homeowners must also be available to let the EPA remediation team in and out of the homes, often requiring homeowners to take off a day of work.

224.   While waiting for their properties to be remediated, EPA also advised Plaintiffs not to undertake construction, landscaping, or gardening projects on their properties.  Some Plaintiffs waited months for their properties to be remediated, while Plaintiffs Cytheria Artis, Earlie Braden, Annie Brooks, Devin L. and Linda Crymes, William Garcia, Berteresa Harris,

Curtis and Nettie Hill, Emma Johnson,  Angela McFerrin, Margo Morris, Donald Mosley, Melissa Peterson,  Jose and Natalia Sanchez, John and Delphine Sullivan, Dwayne Washington, Isaac Washington, and Sarah Willis will have to wait more than a year and a half since they first learned of the contamination for their properties to be remediated.

225.    Each Plaintiff is also subjected to the annoyance of frequent construction noise from the remediation of nearby yards.

> ### iv.    Defendants' contamination has caused Plaintiffs extreme stress and anxiety

226.    Since learning of Defendants' contamination, there has been wide-spread anxiety among the residents who own homes at the Superfund Site, including Plaintiffs.

227.    In addition to the anxiety caused by not being able to sell or rent their properties, Plaintiffs fear for the health and safety of their children and grandchildren.  Many Plaintiffs raised their children on their contaminated properties, and still have young children and/or grandchildren that live with them on their properties.

228.    Plaintiffs also fear that living on contaminated properties will exacerbate other health concerns.

229.    Plaintiff Sara Jimenez, for example, has a genetic kidney disease and needs a kidney transplant.  She is now concerned that lead and arsenic exposure will complicate her kidney transplant.  After discussing the contamination with one of her physicians, the physician told her that she needed to move out of her home immediately.  Sara and Mauro thus purchased another property outside of the Superfund Site and have moved there.

230.    Similarly, Plaintiff Maritza Lopez, who has lived on the Superfund Site since she was 6 months old, has a variety of health issues, including non-cancerous tumors, severe anemia, and Type 2 diabetes, as well as unexplained hemorrhaging, muscle atrophy, and nerve damage.

Her physicians have similarly advised that her health issues may be exacerbated by living on or near toxic contamination.

231.    Plaintiff Harrison Gibbs's wife and daughter also suffer from autoimmune disorders that are exacerbated by toxic contamination.

232.    Remediation by EPA will not fully cure the injuries to Plaintiffs' properties, including but not limited to the diminution of Plaintiffs' property values as a result of the contamination:  the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; the remediation of Plaintiffs' groundwater; the interference with the reasonable use, development, and enjoyment of their properties since they learned of the contamination; the cost and annoyance Plaintiffs have experienced during the remediation of their properties; and the emotional distress Plaintiffs have suffered since learning of the contamination.

233.    Defendants, by their decades-long failure to abate, or even address, hazardous contamination known by Defendants to exist on the Plaintiffs' properties, as well as their failure to warn Plaintiffs of the release of such hazardous contamination, acted in a willful and wanton manner and in reckless indifference to the safety of Plaintiffs and the use and enjoyment of their properties.  Plaintiffs were the reasonable foreseeable victims of Defendants' conduct.

234.    As a direct and proximate result of the willful, wanton, and reckless acts and omissions of Defendants, Plaintiffs have sustained actual damages and, because of these acts and omissions, it would be reasonable and proper for the assessment of punitive damages to deter Defendants and all others similarly situated from acting in a similar manner in the future.

## COUNT I
### Negligence

235.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 234 of the Complaint, as though fully set forth herein.

236.    Defendants had a duty to Plaintiffs not to permit or allow hazardous substances from Defendants' facilities to contaminate Plaintiffs' properties.  Defendants also had a duty to promptly respond to and remediate any releases of hazardous contaminants in a manner that would prevent further threats to Plaintiffs' properties, and to warn Plaintiffs, directly or through previous owners of Plaintiffs' properties, of the release or threatened release of hazardous substances into or towards the soil used by Plaintiffs. The facilities, and hazardous substances generated therefrom, were within Defendants' exclusive control.

237.    Defendants breached these duties by their negligent acts and omissions in operating and maintaining their facilities; their handling, storage, use, and disposal of hazardous substances; their failure to promptly and effectively address such contamination to prevent further threats to the Plaintiffs' health and properties once known; and their failure to warn Plaintiffs, directly or through previous owners of Plaintiffs' properties, of the release or threatened release of toxic contaminants.

238.    Defendants' breach of their duties to Plaintiffs has caused substantial injury and damage to Plaintiffs and their properties.

## COUNT II
### Private Nuisance

239.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 238 of the Complaint, as though fully set forth herein.

240.    The contamination of soil and groundwater with lead, arsenic, PAHs, and other contaminants at, in, on, or beneath Plaintiffs' properties, and the contamination of the interior of Plaintiffs' properties, occurred and persists because of Defendants' acts and omissions including, but not limited to, their operation and maintenance of their facilities and equipment; their handling, storage, use, and disposal of hazardous substances; their failure to promptly and effectively address such contamination to prevent further migration of the contaminants; and/or their failure to abate such contamination known by Defendants to exist on Plaintiffs' properties.

241.    Defendants' contamination of the soil, groundwater**,** and interiors of Plaintiffs' homes, as well as Defendants' decades-long failure to address such contamination, has substantially interfered with Plaintiffs' reasonable use, development, and enjoyment of their properties.

242.    Plaintiffs have incurred and continue to incur substantial damage as a result of Defendants' contamination, constituting a continuing private nuisance.

### COUNT III
**Trespass**

243.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 242 of the Complaint, as though fully set forth herein.

244.    Defendants had a duty to prevent hazardous substances, including lead and arsenic, used and created at their facilities, from contaminating Plaintiffs' properties.

245.    Defendants also have a duty not to allow the continuance of this wrongful trespass.

246.    Defendants breached these duties by their wrongful acts and omissions, resulting in the release of lead, arsenic, PAHs, and other hazardous substances from their facilities into the

environment, thus causing the migration of such contamination at, in, on, or beneath Plaintiffs' properties, including soil and groundwater, without consent of Plaintiffs.

247.    These contaminants continue to actively migrate at, in, on, or beneath Plaintiffs' properties, without consent of Plaintiffs, by the groundwater that Defendants caused to be contaminated.

248.    The invasion of Plaintiffs' real properties, exclusively possessed by Plaintiffs, by Defendants' contamination, was due to unreasonable, unwarranted, and unlawful conduct of Defendants and constitutes a wrongful trespass upon Plaintiffs' properties.

249.    As a result of Defendants' wrongful trespass, the lawful rights of Plaintiffs to fully use and enjoy their properties have been substantially interfered with, causing Plaintiffs substantial damage.

### COUNT IV
### Negligent Infliction of Emotional Distress

250.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 249 of the Complaint, as though fully set forth herein.

251.    Defendants had a duty to Plaintiffs not to permit or allow hazardous substances from Defendants' facilities to contaminate Plaintiffs' properties and expose Plaintiffs to such substances.  Defendants also had a duty to promptly respond to and remediate any releases of hazardous contaminants in a manner that would prevent further threats to Plaintiffs' health and properties, and to warn Plaintiffs of the release or threatened release of hazardous substances into or towards the soil used by Plaintiffs. The facilities, and hazardous substances generated therefrom, were within Defendants' exclusive control.

252.    Defendants breached these duties by their negligent acts and omissions in operating and maintaining their facilities; their handling, storage, use, and disposal of hazardous

substances; their failure to promptly and effectively address such contamination to prevent further threats to the Plaintiffs' health and properties once known; and their failure to warn Plaintiffs of the release and/or threatened release of toxic contaminants.

253.    Defendants' breach caused hazardous lead, arsenic, PAHs, and other contaminants to directly impact Plaintiffs.

254.    The contamination has caused Plaintiffs significant emotional distress, including: (a) fear of contracting a future illness associated with the contamination; (b) fear that their children, grandchildren, family members, guests, or anyone else who comes into contact with their homes will contract future illnesses associated with the contamination; and (c) fear that the contamination has affected their health.

## V.    RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, and pray:

A.    That the Court award Plaintiffs compensatory and other appropriate damages in an amount to be determined by the evidence at trial, including but not limited to:  the diminution in market value of Plaintiffs' properties resulting from Defendants' contamination; costs for the remediation of other contaminants not addressed by EPA's remedial plan, including but not limited to PAHs; costs for the remediation of Plaintiffs' groundwater; damages for the interference with the reasonable use, development, and enjoyment of Plaintiffs' properties since they learned of the contamination; damages for the annoyance Plaintiffs have experienced during the remediation of their properties; damages for the annoyance Plaintiffs have experienced due to the remediation of their neighbors' properties; and damages for the emotional distress Plaintiffs have suffered since learning of the contamination.

B.      That the Court order punitive damages in an amount sufficient to deter Defendants and other companies and individuals who are similarly situated from acting in a similar manner, because Defendants have acted in a willful and wanton manner and in reckless indifference to the safety of Plaintiffs and the use and enjoyment of their properties in the following ways:

1. Defendants allowed hazardous contaminants, including lead, arsenic, and PAHs, to routinely and frequently emit and/or leak from their facilities into the surrounding neighborhood for decades, without appropriate safeguards to prevent or remedy such releases;

2. Defendants allowed hazardous contaminants, including lead, arsenic, and PAHs, to contaminate the fill material used to raise the ground level at or nearby Plaintiffs' properties, without appropriate safeguards to prevent or remedy such contamination;

3. Defendant U.S.S. Lead stockpiled waste containing hazardous contaminants from its blast-furnace and, once a year, spread the waste over an adjoining 21 acres of wetlands, which was not equipped with safeguards to prevent the release, discharge, spillage, or escape of hazardous contaminants onto Plaintiffs' properties and groundwater, and which leaked and/or spilled into the surrounding area, contaminating Plaintiffs' properties and groundwater;

4. To this day, Defendant DuPont has failed to control hazardous substances on its property, including but not limited to arsenic, cadmium, lead, and zinc which leak and/or spill into the surrounding area, including Plaintiffs' properties;

5. Defendants, to this day, have failed to determine the impact of such contamination of Plaintiff' health and property, when Defendants knew or should have known of the likelihood that Plaintiffs' properties were contaminated;

6. Defendants, to this day, have failed to warn Plaintiffs that their health and property were at risk due to the release of hazardous contaminants from Defendants' facilities;

C.      That the Court award Plaintiffs their reasonable attorney's fees; and

D.      That the Court award Plaintiffs their costs of suit and such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiffs request trial by jury on all issues so triable.


Dated:  October 31, 2017

Respectfully submitted,

CRISTOBAL and THERESA ALVAREZ,
CYTHERIA ARTIS, PAMELA BERRY,
WILLIAM BOLEWARE, EARLIE BRADEN,
ANNIE BROOKS, DEVIN L. and LINDA CRYMES,
EZELL and ALICE FOSTER, WILLIAM GARCIA,
CARMEN GARZA, HARRISON GIBBS,
BERTERESA HARRIS, TERRANCE HILL,
CURTIS and NETTIE HILL, SARA and MAURO
JIMENEZ, EMMA JOHNSON, FRANK KRESICH,
CHINITA LINDSAY, LORI LOCKLEAR,
MARITZA LOPEZ, WILLIAM LUCKETT,
ANGELA MCFERRIN, MARGO MORRIS,
DONALD MOSLEY, RAYMOND MOSLEY,
SANDRA MUNIZ-GARZA, MELISSA PETERSON,
NATALIE ROBINSON, JOSE and NATALIA
SANCHEZ, MADELEINE A.P. SPANN, JOHN and
DELPHINE SULLIVAN, MICHEAL TRAMBLES
and CHANTHINI FOWLER, BERNICE VICTOR,
DWAYNE WASHINGTON, ISAAC
WASHINGTON, JACQUELINE WASHINGTON-
BROWN, SARAH WILLIS, and BETTY ZIC


/s/ David J. Chizewer
David J. Chizewer
Emily D. Gilman
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 201-3938 – David J. Chizewer
(312) 201-3861 – Emily D. Gilman
Email:  david.chizewer@goldbergkohn.com
        emily.gilman@goldbergkohn.com

*Pro Bono Counsel for Plaintiffs*