# Exhibit A

```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3  CRISTOBAL ALVAREZ, et al.     )
                                  )
 4       Plaintiffs,              )
                                  )
 5  vs.                           )  2:17-CV-414
                                  )
 6  ATLANTIC RICHFIELD COMPANY,   )
    et al.                        )
 7                                )
         Defendants.              )
 8
                       TRANSCRIPT OF STATUS HEARING
 9                        January 26, 2023
                   BEFORE THE HONORABLE PHILIP P. SIMON
10                    UNITED STATES DISTRICT JUDGE

11  A P P E A R A N C E S:

12  FOR THE PLAINTIFFS:

13
                          DAVID J. CHIZEWER
14                        STACEY E. PETREK
                          Goldberg Kohn Ltd.
15                        55 E Monroe Street
                          Suite 3300
16                        Chicago, Illinois  60603
                          (312) 201-4000
17

18  FOR THE DEFENDANTS, ATLANTIC RICHFIELD COMPANY and BP WEST
    COAST PRODUCTS LLC:
19
                          DIANA E. REITER
20                        Arnold & Porter Kaye Scholer LLP
                          250 W 55th Street
21                        New York, New York 10019
                          (212) 836-7452
22
                          KATHLEEN A. DeLANEY
23                        DeLaney & DeLaney LLC
                          3646 N Washington Blvd.
24                        Indianapolis, Indiana  46205
                          (317) 920-0400
25
```

```
 1   A P P E A R A N C E S: (Continued)

 2   FOR THE DEFENDANTS, E.I. DuPONT DE NEMOURS AND COMPANY and THE
     CHEMOURS COMPANY:
 3
                         HONOR R. COSTELLO
 4                       Crowell & Morning LLP
                         590 Madison Avenue
 5                       20th Floor
                         New York, New York  10022
 6                       (212) 223-4000

 7                       JANELLE P. KILIES
                         Lewis Wagner LLP
 8                       1411 Roosevelt Avenue
                         Suite 102
 9                       Indianapolis, Indiana  46201
                         (317) 237-0500
10

11   ALSO PRESENT:       Harold Abrahamson, Esq.
                         Thomas M. Connor, Esq.
12                       Roy P. Amatore, Esq.
                         H. Max Kelln, Esq.
13                       Colin E. Flora, Esq.
                         Eric S. Pavlack, Esq.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            (The following proceedings were held in open court

 2        beginning at 10:26 a.m., reported as follows:)

 3               DEPUTY CLERK:  All rise.

 4               THE COURT:  You can be seated.

 5        Good morning, everyone.

 6        All right.  We're on the record here this morning in

 7   several different cases based on an order I issued back in

 8   early December.

 9        So just to get this teed up, we have -- I'm going to be

10   colloquial here.  We have the Holiday case, 2:16-CV-525; we

11   have the Barbee case, 2:17-CV-193; the Alvarez case,

12   2:17-CV-414; the Baker case, 2:17-CV-429; the Adams case,

13   2:18-CV-375; and the S.A., et al. case, 2:21-CV-359.

14        So I set this omnibus, sort of, status hearing on all of

15   those cases because, you know, they're obviously related to one

16   another, at least the way I look at it.  And all the cases were

17   reassigned to me, I don't know, sometime in November I think;

18   and it would be very helpful to me to hear from -- give

19   everybody an opportunity to be heard.

20        I have reviewed the dockets.  And, frankly, these dockets

21   are impenetrable.  I ask you to put yourself in my position and

22   have these six cases, sort of, dumped on me and to try to sort

23   of figure out what in the hell is going on here.  I don't

24   understand it.  So just, please, give me a moment.

25            You know, I have reviewed these documents -- or these
```

```
 1   dockets, and I have a lot of questions that I just don't

 2   understand.  Listen, Judge Kolar has done a fantastic job

 3   trying his level best to get these things on track; but, as I

 4   said, there's a lot that I don't understand.

 5       How are we six or seven years into these cases and we're

 6   still at the pleading stage?  I mean, these cases are 2016.  My

 7   law clerk, he was telling me he was a sophomore in college when

 8   the cases were filed.  It's crazy.

 9       Why are there six different lawsuits?  I don't understand

10   that.  They all relate to the same basic transaction and

11   occurrence, as far as I can see.  Why are some plaintiffs named

12   in more than one lawsuit?

13       For example, I saw that this Mr. -- I think it's

14   Mr. Alvarez is in one lawsuit making claims of personal

15   injuries, essentially, and then is in another lawsuit making

16   property damage claims, you know, splitting his claims.  I

17   don't understand that.

18       So I want to get my arms around this because we're going

19   to move these cases along expeditiously.

20       Now, mea culpa here because it's not all your fault.  I've

21   looked at these dockets and, you know, this is too long to get

22   rulings out to you folks on things.  And you're not going to

23   wait 15 months from me to get a ruling on a motion to dismiss.

24   It's just not going to happen.

25       I wanted to have this opportunity to introduce myself -- I
```

 1   don't know many of you -- and to tell you my plan is to move

 2   these along with dispatch, but reasonably.  I'm not

 3   unreasonable, but we've got to move these along.  We can't be

 4   at the pleading stage of lawsuits seven years later.  That just

 5   doesn't make any sense to me.

 6        So what I want to do first is just to go around the room.

 7   I only want to hear from one lawyer in each of these lawsuits

 8   to make this manageable for me.

 9        So who is lead plaintiffs' counsel in the *Holiday* case?

10             **MR. FLORA:**  Your Honor, I'll handle that.  This is

11   Attorney Colin Flora.

12             **THE COURT:**  I'm sorry.  Your name is?

13             **MR. FLORA:**  Colin Flora.

14             **THE COURT:**  Mr. Flora.  All right.

15             **MR. FLORA:**  Your Honor, I think it may serve -- since

16   we are lead counsel --

17             **THE COURT:**  Let me cut you off.  I want to go through

18   this exercise so I just can figure out who I can talk to for

19   each of these cases.  Okay?

20             **MR. FLORA:**  Yes, sir.

21             **THE COURT:**  Just permit me to do that.

22        By the way, I have 90 minutes and not a minute longer

23   because I have a flight to catch.  I'm not here to argue

24   motions or -- I'm just trying to get my arms around this thing,

25   okay.  So just permit me.

 1      Who is lead defense counsel for DuPont in the *Holiday*

 2   case?

 3           **MS. COSTELLO:**  Honor Costello.

 4           **THE COURT:**  How about for the Hammond Group?

 5           **MR. ABRAHAMSON:**  Your Honor, Harold Abrahamson here.

 6   I'm local counsel.  Tom Connor is principal counsel.  He is

 7   driving here from Cincinnati.  He should be here any minute.

 8           **THE COURT:**  Yeah.  Unfortunately, I saw I-65 is a

 9   nightmare.  It is, basically, blocked off.

10           **MR. ABRAHAMSON:**  Right.

11           **THE COURT:**  I understand.

12      Let's go to the *Baker* case.  Who is lead counsel for the

13   plaintiffs in the *Baker* case?

14           **MR. FLORA:**  Again, myself, Your Honor.

15           **THE COURT:**  Mr. Flora.

16      And DuPont, is that also you, Ms. Costello, in that case?

17           **MS. COSTELLO:**  That's correct.

18           **THE COURT:**  Okay.  Just so I'm keeping track here.

19      The same for the Hammond Group.  Okay.

20      All right.  So we have the *Alvarez* case.  That's the

21   Goldberg Kohn firm.

22      Who is lead counsel on that one?  Is that you, sir?

23           **MR. CHIZEWER:**  Yes, David Chizewer, Your Honor.

24           **THE COURT:**  Mr. -- how do you pronounce your name?

25           **MR. CHIZEWER:**  Chizewer.

```
 1              THE COURT:  Chisler (phonetic)?

 2              MR. CHIZEWER:  Were.  Chizewer, not a Chizler

 3     (phonetic).

 4              THE COURT:  Yeah, exactly.  That didn't sound right.

 5     Chizewer.  Got it.

 6          Okay.  And then who represents Atlantic Richfield in the

 7     Alvarez case?

 8              MS. REITER:  I do, Your Honor.  Diana Reiter.

 9              THE COURT:  Okay.  Ms. Reiter.  Got it.

10          All right.  How about DuPont?  Is that you, Ms. Costello,

11     again?

12              MS. COSTELLO:  That's correct.

13              THE COURT:  Okay.  I can't tell the players without a

14     score card here.

15          Barbee case.  We're back to you, Mr. Flora, as lead

16     counsel, correct?

17              MR. FLORA:  Yes, you are, Your Honor.

18              THE COURT:  Okay.

19          DuPont.  Ms. Costello, correct?

20              MS. COSTELLO:  Correct.

21              THE COURT:  All right.

22          And the Hammond Group is you, Harold, correct,

23     Mr. Abrahamson?

24              MR. ABRAHAMSON:  Yes, Your Honor.

25              THE COURT:  In the Adams case who is lead plaintiff's
```

1   counsel in that?

2          **MR. AMATORE:**  Roy Amatore, Judge, A-M-A-T-O-R-E, pro

3   hac vice.

4          **THE COURT:**  And then we have Atlantic Richfield.

5   That's you then?

6          **MS. REITER:**  Yes, Diana Reiter.

7          **THE COURT:**  I'm not showing you as -- did you enter

8   an appearance on that recently?  You have been on that case.

9   My notes then are just wrong.

10      But, Ms. Reiter, I got you.

11      And then, Ms. Costello, for DuPont?

12          **MS. COSTELLO:**  Correct.

13          **THE COURT:**  Mr. Abrahamson.

14      Is this your co-counsel here, Mr. Abrahamson, the

15   gentleman you were just referencing who was on his way?

16          **MR. ABRAHAMSON:**  There we go.

17          **MR. CONNOR:**  Good morning, Your Honor.  Yes, Your

18   Honor, Thomas Connor for the Hammond Group.

19      Apologies for the delay.

20          **THE COURT:**  I understand.  I-65 is a mess.

21      I'm just trying to identify who the players are here and

22   the lawyers in each of these cases.

23      Are you lead counsel on behalf of the Hammond Group in all

24   of these cases that you guys are involved in?

25          **MR. CONNOR:**  Yes, Your Honor.  In all the cases in

```
 1    which the Hammond Group is a defendant, yes, sir.

 2              THE COURT:  So I can talk to you for those cases.

 3         Then, finally, is this S.A. case.

 4         Again, that's yours, Mr. Flora?

 5              MR. FLORA:  Yes, it is, Your Honor.

 6              THE COURT:  Okay.  And for the defense we would have

 7    Ms. Costello and Mr. Connor, right?

 8              MS. COSTELLO:  Correct.

 9              THE COURT:  Okay.

10              MR. AMATORE:  Your Honor, there was another defendant

11    in the Adams case you did not reference, U.S. Smelter.

12              THE COURT:  Who has entered an appearance on that?

13    Do you know?

14              MR. AMATORE:  The name of the attorney?

15              THE COURT:  Yes.

16              MR. AMATORE:  I'm sorry.  I can't recall, Judge.

17              MS. COSTELLO:  Kevin Toner and some attorney from

18    Faegre Drinker.

19              MS. REITER:  Max Kelln is the other lawyer.

20              THE COURT:  Is there anybody in the courtroom who

21    represents that entity?

22         (No response.)

23              THE COURT:  Okay.  Thank you.

24         All right.  So what I want to do is go through each one of

25    these lawsuits and give you guys an opportunity to answer some
```

1  of my questions that I have already articulated and give me

2  some plan about how we're going to move forward here in a

3  productive way.  Okay?

4      So let me just ask you first, Mr. Flora.  This totally

5  perplexes me.  You and the *Alvarez* firm represent the

6  plaintiffs in *Holiday*, *Baker*, and *Barbee*, correct?

7          **MR. FLORA:**  Correct, Your Honor.

8          **THE COURT:**  Why are there three lawsuits?

9          **MR. FLORA:**  So, functionally, the reason there's

10  three lawsuits is because we ended up getting clients across

11  three different periods of time.  The initial batch of clients

12  we had, we filed in the *Holiday* case, filed in state court.

13  That was then removed to federal court.

14      As you can see from the docket, we did not agree that

15  there was federal jurisdiction.  So when we got additional

16  plaintiffs, we couldn't file in federal court.  We didn't think

17  there was jurisdiction.  So we can't tell this Court --

18          **THE COURT:**  So why weren't they consolidated?  I

19  mean, that ship sailed four years ago.

20          **MR. FLORA:**  Your Honor, we moved -- once we got the

21  appeal done in the *Baker* case and jurisdiction was settled, we

22  moved --

23          **THE COURT:**  Are you Mr. Kelln?

24          **MR. KELLN:**  Yes, I am.  Sorry for the delay.

25          **THE COURT:**  No, I understand.  I-65 has been a

1    disaster.  I'm just trying to identify who is who here.  I

2    understand now.

3              **MR. KELLN:**  Yep.

4              **THE COURT:**  Go ahead, Mr. Flora.

5              **MR. FLORA:**  So at that point it was our plan to

6    consolidate the cases, file one master complaint.  We filed a

7    motion to consolidate.  It was resisted by Atlantic Richfield,

8    who also filed a motion to sever the claims, and that was

9    denied.

10        So, yes, it would be our interest to have those three

11   cases, in particular, and probably also the *S.A.*, or shorthand

12   *Allen*, which is the parental representative in that case -- we

13   would be fine consolidating the four of those cases and even

14   doing one master complaint for them.

15             **THE COURT:**  You are saying there's four case?

16             **MR. FLORA:**  Well, the *S.A. Allen*, which we represent,

17   is the newest one.  That was just filed because we got 10 new

18   minors we had to bring claims on behalf of, so that was a new

19   case that we -- because of the --

20             **THE COURT:**  ARCO is no longer in any of those cases,

21   correct?

22             **MR. FLORA:**  Correct.

23             **THE COURT:**  Okay.

24        So let me ask you, Ms. Costello, do you resist

25   consolidating those --

1        **MS. COSTELLO:**  We do.

2        **THE COURT:**  -- so that I can make this manageable?

3        **MS. COSTELLO:**  We do, Your Honor.

4     We believe that there's nothing that a consolidation would

5  achieve that can't be accomplished through coordination and

6  stipulations.

7        **THE COURT:**  What's the downside to the consolidation?

8        **MS. COSTELLO:**  Well, Your Honor, we've noted on the

9  record that we reserve our right to sever the claims because

10  the individual claims are actually too unique, and so we don't

11  actually think they should be tried together.

12        **THE COURT:**  Okay.  I understand that.  But they filed

13  a motion to certify the class in the *S.A.* case.  I know you

14  filed a motion to strike.  That seems preemptive to me, out of

15  ordinary, in my way of thinking, you know.

16     They want class allegations.  They file a motion to

17  certify the class, then you resist it.  And I decide one way or

18  the other.  But you have, sort of, preemptively tried to cut it

19  off at jump street.  I don't understand that.

20        **MS. COSTELLO:**  Two comments, Your Honor.

21     First, the class allegations only relate to minors; so

22  there will be adult individual claims proceeding regardless of

23  what happens with the motion to strike class allegations.

24     Second, again, it's this idea of these claims are really

25  unique individual claims.  Liability cannot be established for

1   each plaintiffs' claim on a class-wide basis.

2           **THE COURT:**  Why not?

3           **MS. COSTELLO:**  Because there will be individual

4   issues of causation for each plaintiff that they are going to

5   have to show medical causation.  There's going to be unique

6   defenses.  There will be, you know, differences in injuries and

7   damages.

8           **THE COURT:**  Okay.  Fair enough.  That's something it

9   sounds like you would fight out when they try to certify the

10  class.  Maybe you have good arguments one way or the other.

11  But you've kind of flipped the script by trying to do it

12  preemptively; that's what I'm not understanding.

13      And I'm also not understanding why those four lawsuits

14  that are represented by the same law firm that are making the

15  identical claims against your client, why for purposes of just

16  expediency we wouldn't handle them -- so I'm not flipping

17  through four dockets.

18      Do you understand these dockets are a mess?

19          **MS. COSTELLO:**  I do.  I understand it's a very

20  complicated procedural history in each of the cases.  I

21  understand that.

22          **THE COURT:**  So I'm not trying to be argumentative

23  with you.  I'm not understanding why -- you may be right that

24  these should be all done individualized, and we can have that

25  argument.  But, initially, why wouldn't we, at least,

1  consolidate them into the earliest case, the *Holiday* case?

2      **MS. COSTELLO:**  Well, Your Honor, the parties have

3  actually already briefed the issue of consolidation.  And in, I

4  believe it was, spring of 2021, Magistrate Judge Kolar found

5  that there wasn't enough in the record for him to decide that

6  he could properly consolidate them at that time.  And given the

7  procedural posture we're in, there's nothing new in the record

8  to support it.  Maybe down the road we could reconsider.

9      **THE COURT:**  All right.  Fair enough.  I guess I'll

10  flip through four dockets.  It just doesn't -- with all due

11  respect to Magistrate Judge Kolar, I don't understand that.

12    You are not being prejudiced in any way.  What I'm asking

13  is -- it makes things a little bit easier for the Court when

14  you have the same lawyers and the identical claims.  Every

15  plaintiff in those four cases either lived in the housing

16  complex or went to the elementary school, and why they are in

17  four different cases I just don't understand.  I understand how

18  it got there, but I don't understand why it needs to stay

19  there.  Be that as it may.

20    What else you want to tell me?

21      **MR. FLORA:**  Your Honor, we could move orally or we

22  can file a motion to consolidate.  We agree 100 percent.  We

23  end up filing four responses to motions to dismiss that are

24  basically the exact same cut and paste.  We are in favor of

25  putting them all in one case.

```
 1        If you take an oral motion, I will move right now.  If you
 2   want to --
 3            THE COURT:  No, I'm not taking an oral motion.  I'm
 4   telling you -- I have done my best to get through this mess.  I
 5   have no idea whether what counsel is saying has legs or not.
 6   I'm not just going to at the seat of my pants tell you to
 7   consolidate it.  I'm telling you what my instincts are and
 8   that's all.
 9        So if you want to move to consolidate them, I will put the
10   ball in your court and then we'll brief it and I'll get an
11   opinion out to you promptly.
12            MR. FLORA:  All right.
13            THE COURT:  Okay.  So tell me where exactly we are in
14   the Holiday case.
15            MR. FLORA:  In the Holiday case we now are at the
16   motion to dismiss stage.
17            THE COURT:  Seven years later?
18            MR. FLORA:  Seven years later.
19        We have jurisdiction established.  That was established
20   with the conclusion of the Seventh Circuit's ruling in the
21   Baker appeal.  And then following that, we got the rulings in
22   the initial round of motion to dismiss.  Then after that we
23   filed a motion for leave to amend, which was filed within two,
24   three months after the rulings on the motion to dismiss.
25        We briefed the motions for leave to amend.  We got a
```

1    ruling on that in, I believe, September of 2022.  Then we filed

2    our new amended complaints.  And we're on the motion to dismiss

3    those amended complaints.

4              THE COURT:  Okay.  As I understand, the motion to

5    dismiss was ripe as of last week; is that right, Ms. Costello?

6              MS. COSTELLO:  That's correct.  Yes.

7              THE COURT:  Of course, you've also filed your motion

8    to strike the class allegations that we talked a little bit

9    about.

10        So that's all teed up, ready for me to decide, right?

11             MR. FLORA:  Yes, Your Honor.

12             THE COURT:  So how many plaintiffs are in the new

13   iteration of the complaint, roughly?

14             MR. FLORA:  I would have to double-check, but I think

15   it's probably about 219, 220 in the *Holiday* case.  We

16   originally had --

17             THE COURT:  Were any of those subject to

18   Van Bokkelen's ruling that you can't amend?  Wasn't there an

19   earlier motion to dismiss or no?

20             MR. FLORA:  There was an initial round of motions to

21   dismiss that Judge Van Bokkelen ruled on in the summer of 2020,

22   I believe August of 2020.

23             MS. COSTELLO:  August of 2021.

24             THE COURT:  Okay.

25             MR. FLORA:  My apologies.  2021, yes, because 2020 we

```
 1   are still on the appeal.

 2       In 2021 we got the rulings on the motion to dismiss, and

 3   in those rulings it granted -- basically granted leave that we

 4   could -- it directed us to file leave to -- or a motion to seek

 5   leave to file an amended complaint.  So that was the next

 6   stage, and it gave us a timeline to do that.

 7           THE COURT:  Okay.

 8       So, Ms. Costello, can I ask you -- again, I don't want to

 9   get into the substance of this too much because I am not

10   prepared to do it.  What I was trying to get at with my

11   question is, is one of the arguments that something that Judge

12   Van Bokkelen did is dispositive and prevents him from doing in

13   the amended complaint certain things?

14           MS. COSTELLO:  It was actually Magistrate Judge

15   Kolar.

16           THE COURT:  Okay.

17           MS. COSTELLO:  Judge Van Bokkelen dismissed all the

18   claims largely because plaintiffs had not alleged any present

19   physical injury.  Plaintiffs then filed a motion to file an

20   amended complaint and many of the same plaintiffs still did not

21   allege a present physical injury.

22       Magistrate Judge Kolar, in September of 2022, then held

23   that Judge Van Bokkelen told those plaintiffs what they needed

24   to do, they failed to do it in the amended complaint, and that

25   was -- he held that they had lost their chance and they didn't
```

```
 1   have a right to seek further leave to amend.

 2        So we believe, however, when plaintiffs actually got

 3   around to filing the amended complaint, after Magistrate

 4   Judge Kolar's order, some of those plaintiffs all of a sudden

 5   changed --

 6             THE COURT:  I'm sorry to interrupt.  What did he

 7   actually order?

 8             MS. COSTELLO:  He ordered a certain number of

 9   plaintiffs could allege a negligence claim because they had

10   alleged present physical injury.  And I believe it was like a

11   hundred -- and well over a hundred plaintiffs could not allege

12   a negligence claim because their proposed amended complaint did

13   not propose a present physical injury.

14             THE COURT:  Nevertheless, a second amended complaint

15   does that?

16             MS. COSTELLO:  Yes.

17             THE COURT:  That's something I'll have to figure out.

18   Okay.

19        Let me just -- touching for a tiny bit on the substance,

20   because I have glanced at the motions but that's all I have

21   done.  Would you explain to me, like, what is this modified

22   impact rule and bystander rule in a brief --

23             MS. COSTELLO:  So to state a negligent infliction of

24   emotional distress claim in Indiana, we need to either satisfy

25   the bystander rule or the modified impact rule.  I believe --
```

1   plaintiffs can correct me if I'm wrong -- they don't contend

2   that they are stating a claim under the bystander rule.

3       Is that correct?

4           **MR. FLORA:**  That's correct.

5           **MS. COSTELLO:**  So it really comes down to the

6   modified impact rule.

7           **THE COURT:**  What does that mean?  What is that rule?

8           **MS. COSTELLO:**  That means that plaintiffs must have

9   suffered a direct physical impact from defendant's conduct that

10  then caused the emotional distress, and the parties dispute

11  what is a sufficient direct physical impact.

12          **THE COURT:**  Wow.  I'm surprised to hear that.

13      So you can't have a negligent infliction of emotional

14  distress claim unless you also were the person who was

15  subjected to the underlying negligence, some outrageous

16  behavior?

17          **MS. COSTELLO:**  Well, so that's where the bystander

18  rule comes in, if you didn't experience it but someone close to

19  you did.  If you are a bystander to some accident, for example,

20  and your child was killed, that would apply in that

21  circumstance.

22          **THE COURT:**  So let's take a situation where I own a

23  home next to a site.  There's a polluter on the site.  They are

24  discharging arsenic or some horrible substance.  The jig is up

25  and the EPA does a search warrant and it's all discovered, the

1   bad things that have been going on.  I live next door.  I

2   haven't been physically harmed, but I'm greatly concerned with

3   what has taken place next door.  That wouldn't state a claim

4   for negligent infliction of emotional distress because I

5   haven't been impacted?

6           **MS. COSTELLO:**  You would have to show a direct

7   physical impact, and our contention is that exposure is not

8   enough.  Interestingly, the Supreme Court, in a slightly

9   different context, has agreed that exposure is not enough.

10          **THE COURT:**  Okay.  That's something I have to dig

11  into.

12          **MS. COSTELLO:**  That's the dispute.

13          **MR. AMATORE:**  Your Honor.

14          **THE COURT:**  I'll give you a minute to respond to

15  that.

16          **MR. AMATORE:**  Did you inhale any of it, Your Honor,

17  while you were the next-door neighbor?  If you inhaled it, you

18  ingested it.  You have a direct physical impact, just so you

19  understand our theory, ingestion.

20          **THE COURT:**  I understand.

21          **MR. FLORA:**  Your Honor, a couple of finer points on

22  there.

23          **THE COURT:**  Just for the record, this is Mr. Flora

24  talking?

25          **MR. FLORA:**  Yes, Your Honor.

1          **THE COURT:**  So my court reporter can keep you

2     straight.

3          **MR. FLORA:**  So one really quick fix I need on

4     DuPont's statement there is the impact doesn't have to cause

5     the injury.  In fact there's an Indiana Supreme Court case that

6     really shows the scope of modified impact.  You have a woman

7     who was with her friend --

8          **THE COURT:**  That's this *Community Health* case?

9          **MR. FLORA:**  No.  This particular case -- it might be

10    *Shuamber*; it might be *Conder v. Wood*.  I'm forgetting the name

11    of it.  The facts are pretty straightforward.

12       You've got -- two persons are out.  One of them, the

13    woman's friend, gets hit by a vehicle, is getting run over by a

14    truck.  And so the woman, to convince the truck to stop running

15    over her friend, to not hit her with the back tires, slams on

16    the side of the door of the vehicle.  And the Indiana Supreme

17    Court said there just needs to be some degree of an impact,

18    doesn't have to cause harm.  That was an impact.

19          **THE COURT:**  Why isn't that covered by the bystander

20    component of this?

21          **MR. FLORA:**  The way it all started was the law of

22    negligence, was you need to suffer physical injury to get any

23    emotional distress.  And then courts said that's a pretty harsh

24    standard so made two carve-outs.  One was the modified impact

25    rule, that there had to be some degree of an articulable

```
 1    impact.  We can come back to what constitutes an impact.

 2          But the bystander rule was a separate thing which was if

 3    you have a parent that watches a child get run over but the

 4    parent is not about to be hit by the vehicle, doesn't touch the

 5    vehicle, it doesn't meet the modified impact rule.  But, for

 6    the love of God, that parent should be able to recover.

 7                THE COURT:  They're a bystander.

 8          MR. FLORA:  And that's the bystander.

 9                THE COURT:  Okay.  I'm understanding.

10          MR. FLORA:  And the bystander rule requires you to be

11    closely related.  There's a lot of additional nuances to try to

12    keep it from being too expansive.  They don't want somebody to

13    get run over in Times Square and then all of a sudden you've

14    got 10,000 people from a building watching that can sue.

15                THE COURT:  I understand.

16          MR. FLORA:  That's why the bystander is so narrow.

17                THE COURT:  Okay.

18        All right.  Let me just ask Mr. Connor.  Do you want to

19    weigh in on any of this?

20          MR. CONNOR:  Your Honor, I don't -- I think I am in

21    alignment with the presentation that you have heard from

22    Ms. Costello in terms of our understanding.  Obviously, we have

23    briefed those questions.  We'll address --

24                THE COURT:  This is all teed up for me in the motions

25    that were filed and are ripe as of January of this year,
```

```
 1   January 17, right?

 2            MR. CONNOR:  Correct.

 3            MS. COSTELLO:  Correct.

 4            MR. FLORA:  Correct, Your Honor.

 5            THE COURT:  Anything else anybody wants to tell me

 6   about the Holiday case, or does that sort of summarize where we

 7   are at on this thing?

 8            MR. FLORA:  I think it summarizes where we are at,

 9   Your Honor.

10            THE COURT:  Okay.  So a lot of this might get

11   repetitive, but it's helpful for me.

12       Let's talk about -- I'm just going chronologically based

13   on the docket, you know, the cause numbers.  So the next case

14   was 2:17-CV-193, which is the Barbee case.  And, as I

15   understand it, again, that's Mr. Flora.  And the only two

16   defendants left are, again, DuPont and the Hammond Group; is

17   that right?

18            MR. FLORA:  Correct, Your Honor.

19            THE COURT:  Same exact posture as the Holiday case;

20   is that right?

21            MR. FLORA:  At this point, yes.

22            THE COURT:  All right.  Let me just check my notes on

23   this.

24       This one -- this has 19 plaintiffs?

25            MR. FLORA:  Yes, I believe that's correct.
```

1          **THE COURT:**  Are there any -- just so I'm clear, on

2    the ones that you represent, are there any overlap in the

3    plaintiffs?  Like, for some reason, have you named the same

4    plaintiff in more than one lawsuit?

5          **MR. FLORA:**  At one point there were two individuals

6    in the *Holiday* case that were also in, I believe, the *Baker*

7    case.  That has been cleaned up.  There are no longer any that

8    are overlapping amongst our cases.

9          **THE COURT:**  Okay.  So, is that right, 19 plaintiffs

10   left in the *Barbee* case?  Does that sound right?

11         **MS. COSTELLO:**  Yes.

12         **MR. FLORA:**  That sounds right, Your Honor.

13         **THE COURT:**  And they're not named anywhere else, you

14   are representing to me?

15         **MR. FLORA:**  Correct, not in a federal case.  All of

16   our clients are also in a state case that's --

17         **THE COURT:**  I want to talk about that too because

18   that was one of my questions.  Let me segue.

19       Is there anything else to say about the *Barbee* case other

20   than it's fully briefed as of January 17 and you are waiting

21   for a ruling from me?  Is everything in agreement with that?

22         **MS. COSTELLO:**  That's correct.

23         **MR. FLORA:**  Yes.

24         **MR. CONNOR:**  Yes, Your Honor.

25         **THE COURT:**  So let's just segue for a minute.

 1          Who's involved in the -- there's a state case?  Tell me

 2   about all this.

 3              **MR. FLORA:**  Yes, Your Honor.  So we couldn't sue the

 4   State of Indiana in federal court due to sovereign immunity so

 5   we have a separate case that is just against state governmental

 6   entities -- well, not -- state and local governmental entities.

 7   It is purely governmental entities, purely Indiana state law

 8   that is proceeding in the Superior Court in Lake County, which,

 9   for several years, we contested these cases should be as well.

10              **THE COURT:**  Boy, I wish they were.  That's just an

11   editorial comment.

12              **MR. FLORA:**  My apologies, Your Honor.

13              **THE COURT:**  So let me just ask:  The housing complex

14   that we're talking about here --

15              **MR. FLORA:**  Yes.

16              **THE COURT:**  -- has that been razed at this point?

17              **MR. FLORA:**  The West Calumet Housing Complex is gone

18   now, yes.

19              **THE COURT:**  Was that a Section 8, HUD housing?

20              **MR. FLORA:**  Yes, it was.

21              **THE COURT:**  Was the federal government involved in

22   being sued at all at one point, or are they involved in these

23   cases?

24              **MR. FLORA:**  They are not involved in any of our

25   cases, Your Honor.

1       **THE COURT:**  Okay.  Why is the state involved then?

2   I'm not understanding.

3       **MR. FLORA:**  The state is involved in those cases

4   because there was a complex network of -- let's take a step

5   back.  All of this is on top of the U.S.S. Lead Superfund site,

6   so all of these were, for years, subject to some degree of

7   oversight by the EPA, along with the State of Indiana's Indiana

8   Department of Environmental Management.

9       So they were getting information about what was going on

10  on the property that we allege was not being shared with our

11  clients and ultimately led to people being housed on this

12  property, people being exposed to the lead in the soil, being

13  exposed to the lead in the soil at the school as well because

14  we allege, at least with the state entities, they knew and

15  didn't pass the information along.

16      In fact, the catalyst for all of this was the letter that

17  came from Mayor Anthony Copeland in June of 2016 where -- what

18  led him to do that was he all of a sudden was given information

19  from the EPA that the amount of lead on the site was not just

20  poor soil quality, it was at a hazardous level that was posing

21  immediate dangers to all the people on the property.

22      **THE COURT:**  Okay.  But this was a Superfund site

23  going back to like 2009, right?

24      **MR. FLORA:**  It was to some degree that it needed to

25  be remediated because the soil was deemed unusable.  Maybe you

 1   couldn't have farmed it, maybe you shouldn't build a house on

 2   it, but it was not, at that point, determined that people

 3   couldn't live on it, that it was such a high level.

 4           **THE COURT:**  But the site of the housing complex, the

 5   apartment complex --

 6           **MR. FLORA:**  Sure.

 7           **THE COURT:**  -- was that actually where Atlantic

 8   Richfield had their plant?

 9           **MR. FLORA:**  Yes, it was, Your Honor.  And that's why

10   they are out of our case now.

11           **THE COURT:**  Based on those rulings that --

12           **MR. FLORA:**  Yes.

13           **THE COURT:**  I understand that.

14           **MR. FLORA:**  Yes.

15           **THE COURT:**  Okay.  So we have that property where the

16   apartment complex sat.

17       What's there now, by the way?  Is it just a brown field

18   basically?

19           **MR. FLORA:**  To the best of my knowledge, it's just a

20   brown field at this point.

21           **THE COURT:**  Okay.  And then there's like, I'll call

22   it, a penumbra around it where there were individual housing

23   and an elementary school?

24           **MR. FLORA:**  And the school was also on the site.

25           **THE COURT:**  Has that been razed?

```
 1              MR. FLORA:  I believe the school has been razed, yes.

 2              THE COURT:  Okay.  And so how many -- how far from

 3    the housing complex does this go out in a perimeter?

 4              MR. FLORA:  Honestly, I don't know because almost all

 5    of my clients are on the housing complex so that's been my

 6    focus.  As far as what it's reached, the houses beyond that,

 7    perhaps Mr. Amatore --

 8              MR. AMATORE:  I have one, Judge, on -- roughly

 9    neighbors to the old DuPont property.  And, again --

10              THE COURT:  So is this like within a block or

11    something of where the property -- the housing complex used to

12    be?

13              MR. AMATORE:  I don't know if I can give you that

14    kind of precision, but, yes, close, you know, to consider

15    adjacent -- roughly adjacent property to survive a motion to

16    dismiss for nuisance.

17              THE COURT:  Okay.

18              MR. AMATORE:  Not to survive it, Judge, but to be

19    allowed to replead it.

20              THE COURT:  Sir, you represent the property owners,

21    the adjacent property owners, correct?

22              MR. CHIZEWER:  I do, Your Honor.

23              THE COURT:  Can you help me out on this?

24              MR. CHIZEWER:  So they're blocks.  I mean, in terms

25    of -- I represent the owners of 39 different properties that
```

```
 1    are within blocks of the public housing complex that has since

 2    been razed.

 3              THE COURT:  Okay.

 4              MR. CHIZEWER:  This is properties that were tested

 5    and found to be contaminated.

 6              THE COURT:  We'll get to your case in a minute but

 7    just so I'm understanding the layout here.

 8         Okay.  So that state case, where is it at?

 9              MR. FLORA:  It is still in discovery, Your Honor.

10              THE COURT:  Okay.

11              MR. AMATORE:  It is partially in the pleading stage

12    as well, Judge.

13              THE COURT:  When was that filed?

14              MR. AMATORE:  Just to say -- in the state case, on

15    January 20, the plaintiffs, with leave of Court, filed a motion

16    for leave to file a second amended complaint.

17              THE COURT:  When was that?  I'm sorry.

18              MR. AMATORE:  That was filed on January 20 in the

19    state case by the Adams plaintiffs so there's a pending motion

20    for leave to file a second amended complaint.

21         There was dismissal in the case early on -- well, that's

22    in the state case.  But, you know, we're anticipating not being

23    an issue at least for a few months.  I'm sure that's going to

24    be briefed.

25              THE COURT:  Is it just the state is the defendant or
```

 1  are other people defendants?

 2          **MR. AMATORE:**  No, the East Chicago Housing Authority.

 3          **THE COURT:**  Okay.

 4          **MR. AMATORE:**  Mayor Anthony Copeland.  I think

 5  Tia Cauley as a representative of that agency.

 6          **THE COURT:**  Yeah.

 7          **MR. AMATORE:**  There's more, Judge.

 8          **THE COURT:**  Okay.  All right.

 9          **MR. FLORA:**  Your Honor, to be clear, there's two

10  state cases.  Mr. Amatore has the *Allen* case.  We have a single

11  case over there.  The two have been consolidated for purposes

12  of discovery.  Our case was filed earlier.  Things are

13  slightly --

14          **THE COURT:**  Who is your judge over there?

15          **MR. AMATORE:**  Scheele, formerly Sedia, but

16  Judge Scheele has now taken over that case.

17          **THE COURT:**  Okay.  So is there anything else we need

18  to talk about relating to the *Barbee* case?  Does that pretty

19  well tee it up from where we are at?

20          **MR. FLORA:**  Yes, Your Honor.

21          **THE COURT:**  Okay.

22       So now the next one was your case.  I'm going to mess this

23  name up again.

24          **MR. CHIZEWER:**  My last name?

25          **THE COURT:**  Yes.

1            **MR. CHIZEWER:**  Chizewer.

2            **THE COURT:**  I'm sorry.

3            **MR. CHIZEWER:**  No worries.

4            **THE COURT:**  How did we get here?  We're also, what,

5    six years in here.  Give me your perspective.

6            **MR. CHIZEWER:**  I would like to explain that,

7    Your Honor.

8        First of all, I think it is important to understand that

9    we're handling this case completely pro bono.  We are not on a

10   contingency basis or anything, and so the damages we're seeking

11   are limited.  We weren't prepared to file claims for personal

12   injury, so our -- we have no personal injury claims whatsoever

13   in this case.  We don't think personal injuries have anything

14   to do with our case.

15       We filed our case in 2017, in October of 2017.  There was

16   a fully briefed motion to dismiss by April of 2018.  It took

17   the Court three years -- over three years to resolve that.

18            **THE COURT:**  Yeah.

19            **MR. CHIZEWER:**  We tried to do discovery in the

20   meantime.  The defendants, of course, were not willing to

21   voluntarily participate in discovery; so we filed a motion

22   which -- to have a Rule 16 conference which was denied.  And so

23   there's nothing we could do.

24       Even after -- finally, in July of 2021 when the motion was

25   partially granted and partially denied and we were allowed to

```
 1    proceed with the bulk of our claims, the defendants still

 2    didn't agree to participate in a Rule 26(f) conference so we

 3    had to file another motion, and finally that was granted and a

 4    Rule 16 conference was held.  And we had a -- we embarked on

 5    discovery.  So we are in discovery right now.

 6         THE COURT:  You must be looking at me like what in

 7    the world is this guy talking about, complaining about how long

 8    these have taken.

 9         MR. CHIZEWER:  Your Honor, you may recall -- and the

10    reason we got involved in this case is that our firm helped out

11    two, you know, nonprofit environmental law firms.  And when

12    certain residents were trying to intervene in the CERCLA case

13    that was going on --

14         THE COURT:  Yeah.  That was in front of me, right?

15         MR. CHIZEWER:  That was in front of Your Honor.

16      And our firm helped out with the University of Chicago

17    Environmental Law Clinic, Northwestern Environmental Law Clinic

18    and the Schriver Center.

19      That motion Your Honor ultimately denied, the right to

20    intervene, but we felt like some of the homeowners weren't

21    getting justice, and so we wanted to help.  They came to us and

22    asked if we could do anything else for them, so we agreed to

23    take on this limited case where we are only seeking,

24    number one, the emotional distress damages from learning that

25    your property has been contaminated likely for decades after
```

```
 1   your family has been there and playing outside, et cetera.  Not
 2   related to any physical injury, just the emotional trauma that
 3   you realize for decades your property has been contaminated.
 4   That's number one, and, number two, diminution and property
 5   value.
 6            THE COURT:  Have the properties, in fact, gone down
 7   in value?
 8            MR. CHIZEWER:  We believe so.
 9            THE COURT:  Were these all homes that were built
10   post-World War II, I assume?
11            MR. CHIZEWER:  Yeah.  Most of them -- many of them
12   were purchased, at least, in the 1950s.  And just so Your Honor
13   knows also, this is an enormous -- we have 39 properties, 45
14   plaintiffs.  This is an enormous undertaking.  Many of the
15   owners of these properties are elderly, some in their 80s, 90s.
16   So it's difficult to communicate with them.  In the three years
17   that we were waiting, four of my clients have died, so we have
18   the complications with that.
19        So, you know, I understand that the case is old; but, you
20   know, as we've explained, I don't think that's at all on us.
21        But it is going to take us a while just because of the
22   communication.  A lot of them -- some of them -- I shouldn't
23   say a lot.  I don't want to exaggerate.  Several of them don't
24   have email.  They have to use their children to communicate.
25   So it is a big undertaking, Your Honor.
```

```
 1              THE COURT:  I appreciate you doing it.

 2         That's one of the reasons I sort of did the mea culpa.  I

 3    understand this isn't just counsels' fault.  It's a lot --

 4    anyway.  You understand.

 5              MR. CHIZEWER:  Yes.

 6              THE COURT:  Let me ask you, in particular.  I didn't

 7    understand why -- so we have -- is it Mr. Alvarez?  Is that a

 8    man, Cristobal?

 9              MR. CHIZEWER:  Yes, a man and a woman.

10         I have to be honest, Your Honor.  I wasn't aware until

11    recently that he was even a part of the other case, but I

12    assume the reason for that is because we are not handling any

13    personal injury claims.  So if he or she wants to make personal

14    injury claims, they would have to do that with another firm.

15              THE COURT:  All right.  It's not ideal, but I

16    understand.

17              MR. CHIZEWER:  Right.

18         Then just -- I'm sorry.

19              THE COURT:  So what has been going on in the case?

20    As I understand, this is the one case that's through the

21    pleadings, right?

22              MR. CHIZEWER:  Correct.

23              THE COURT:  And you're in discovery?

24              MR. CHIZEWER:  Correct.

25              THE COURT:  Talk to me a little bit about what's been
```

 1   going on in discovery.

 2          **MR. CHIZEWER:**  We served document requests and

 3   interrogatories, as did the defendants.  We've had many, many

 4   meet-and-confer conferences about what documents are going to

 5   be produced, lots of letters going back and forth.  We did have

 6   our first deposition earlier this week of one of our clients.

 7   There are more scheduled.

 8          So we're trying to -- and, you know, there's disputes

 9   about, for example, whether medical records are discoverable

10   given that we're not suing for any personal injury or any

11   emotional distress that's connected to any personal injury.  So

12   that may or may not wind up before the Court if we can't reach

13   some kind of compromise on that.

14          So there's been -- you know, the defendant says they have

15   the right to do -- are fighting this case very hard.  They have

16   said they want to take -- you know, originally, they wanted to

17   take over 225 depositions just in our case alone.  We do have

18   45 individual plaintiffs, but -- and, again, the damages --

19   just to be completely frank, the damages we are seeking,

20   ultimately -- I'm not saying what our clients are ultimately

21   entitled to, but we didn't file this case for them to get rich

22   or for anybody to get a windfall.  But the defendants -- you

23   know, they want to fight scorched earth and not discuss

24   settlement, so that's where we are.

25          **THE COURT:**  What are these homes generally worth?

1   Are these $150,000 homes?  $200,000 homes?  Something like

2   that?

3           MR. CHIZEWER:  Let me just -- I'll give you an

4   example, Your Honor, that one of the homes was purchased in

5   1955 for $8500.

6           THE COURT:  Okay.

7           MR. CHIZEWER:  If it had received the normal

8   appreciation of an Indiana home throughout the state, might be

9   3 percent, I think that might bring you to an expected sale of

10  80 to $85,000.  They sold their home in 2019 for $20,000.

11      That's not scientific, that's totally anecdotal.

12          THE COURT:  No, I understand.

13          MR. CHIZEWER:  I understand there's lots of -- it's

14  going to be complicated to try and prove diminution of value.

15  I'm sure there's a lot of arguments why -- other reasons why in

16  this particular area the homes may have declined.  I know those

17  arguments are going to be made.  But when you find out your

18  home has been contaminated with lead and arsenic, I would think

19  that's going to reduce the value significantly.

20          THE COURT:  So when you say the homes were

21  contaminated, what exactly do you mean by that?

22          MR. CHIZEWER:  So the EPA came -- a lot of this --

23  all of this really happened -- sort of the threshold event --

24  because even though this was declared a Superfund site -- I

25  thought it was 2012.  I may be wrong about that.

1          Many of the residents and community didn't know they were

2     living on a Superfund site even after that was declared.  But

3     sometime in 2016, the Indiana Public Housing Authority told the

4     people who lived in the public housing complex, who many of

5     them lived there since the '70s, that they had 90 days to find

6     a new home because their homes were so contaminated.

7          That's sort of what set off the CERCLA case, the motion to

8     intervene, ultimately property remediation.  But the EPA came

9     out and then they tested the soil, the ground soil, at a lot of

10    the nearby homes.  And then they told people what the results

11    of that testing was.  And in many cases, either the homes or

12    the homes next door to them, the first, you know, 12 inches,

13    whatever it was, of the ground soil was contaminated with lead

14    and sometimes at four or more times the healthy level and

15    contaminated with arsenic right in their backyard.

16              **THE COURT:**  Does this affect the ground water?

17         **MR. CHIZEWER:**  Soil.

18              **THE COURT:**  Just soil?

19         **MR. CHIZEWER:**  Just soil.  That's what the testimony

20    is.

21              **THE COURT:**  Okay.  Okay.

22         So, I mean, you have 45 plaintiffs; is that right?

23              **MR. CHIZEWER:**  Yeah.  Four of them -- four of

24    those -- just to be clear, four of those have died, and we're

25    trying to --

```
 1          THE COURT:  And you're trying to figure out who is
 2    the representative?
 3          MR. CHIZEWER:  Exactly.
 4          THE COURT:  Because some died without a will.
 5          MR. CHIZEWER:  Correct.
 6          THE COURT:  And it's a mess.
 7          MR. CHIZEWER:  Yeah.
 8          THE COURT:  Yeah.  Okay.
 9       But all in all, it's not a case -- I don't mean to be
10    disrespectful, but it's not a high-dollar case, right, I mean,
11    in the bigger look at things?
12          MR. CHIZEWER:  Look, we tried to -- I don't know how
13    you put -- it's difficult -- I'm being very transparent because
14    I have nothing to hide.  It's difficult to put a value on the
15    emotional distress that somebody faces when they realize that
16    they and their children have been playing in soil, planting
17    plants.  It's difficult to put a dollar value on that.
18       I will tell you we tried to look at -- I think we looked
19    at -- we found 70 emotional distress cases -- judgments in
20    Indiana.  The average emotional distress damage value was over
21    $300,000.
22          THE COURT:  But that's usually in conjunction with
23    some underlying harm, physical harm.  And that's normally
24    where -- I mean, when -- I think.
25          MR. CHIZEWER:  As I said -- you know, I'm not going
```

 1   to prejudge the total damages now.  There will be experts.  We

 2   need to know how much the property is down in value.  We,

 3   obviously, had to allege, which we feel we did in good faith,

 4   that there was at least $75,000 of damages to each person.

 5        But as I said, this is not a case where we're hoping to --

 6   that our clients are hoping to retire on.  Obviously, we are

 7   not.  We are doing it for free.

 8             **THE COURT:**  Okay.  That's very helpful.  Thank you.

 9        So I want to hear from both Ms. Costello and Ms. Reiter

10   about your perspective of where we are at on this case and --

11   because my message to Judge Kolar is going to be we're going to

12   get this going.  Like, we're not foot dragging any longer on

13   discovery and messing around with writing letters.  We're

14   getting going.

15        So, Ms. Reiter, talk to me a little bit about your

16   perspective on this case.

17        Is this the only case that ARCO is left in?

18             **MS. REITER:**  Atlantic Richfield is in this case and

19   the *Adams* case.

20             **THE COURT:**  Okay.  So when I say ARCO, is that

21   different from Atlantic Richfield?

22             **MS. REITER:**  No, it is referring to the same entity.

23             **THE COURT:**  Okay.

24             **MS. REITER:**  The name is Atlantic Richfield Company.

25             **THE COURT:**  Understood.  From a kid, I used to go to

1  the ARCO station.

2          **MS. REITER:**  Right.  Understood.

3          **THE COURT:**  That's what I'm thinking.

4      Okay.  So what's your perspective on this, and when can we

5  reasonably expect discovery to close and get this thing briefed

6  up on whatever dispositive motions?

7          **MS. REITER:**  Certainly, Your Honor.

8      I hear your message about moving the case.  I think this

9  case is moving.  Discovery has been proceeding a pace as

10 Mr. Chizewer indicated.  We did start plaintiff depositions

11 earlier this week.  We have a number more that have been

12 scheduled for next month, and we expect to continue to schedule

13 additional plaintiff depositions.  We have produced a

14 significant number of documents.  And as Mr. Chizewer knows, we

15 are reviewing additional documents to be produced.

16     The letters that Mr. Chizewer referenced are our effort to

17 resolve disputes between the parties about what material is

18 discoverable, and I think the parties have been working well

19 together to try to resolve those disputes so that we don't have

20 to go to Magistrate Judge Kolar with a huge number of disputes.

21 That said, of course, we anticipate there may be certain issues

22 we can't work out, but so far we have been able to resolve most

23 of our issues.

24     I also agree with Mr. Chizewer that the case is going to

25 take time to go through discovery because there are 41

 1    individual plaintiffs plus the four decedents that Mr. Chizewer

 2    referenced.  And then for each individual plaintiff we have to

 3    depose additional witnesses, and Mr. Chizewer understands this

 4    and agreed to this, including real estate agents, prospective

 5    buyers that the plaintiffs allege refused to proceed with the

 6    sale because of the contamination.  We have to depose family

 7    members.

 8            **THE COURT:**  They are making these disclosures?

 9            **MS. REITER:**  Exactly, Your Honor.

10        For each plaintiff, it could be as many as four additional

11    witnesses that we have to depose.  So I understand that the

12    number of depositions sounds high, but it actually makes

13    complete sense in this case, and I think that's why plaintiffs

14    agreed to it.

15        Plaintiffs and the defendants have agreed to a proposed

16    close of fact discovery of August next year.  We think, given

17    the amount of time that this has taken so far and the number of

18    depositions that we have to schedule, that makes sense; and so

19    that is the proposal that we have presented to Magistrate

20    Judge Kolar in the parties' joint status report that was

21    submitted and that Your Honor perhaps has reviewed.

22        Just to respond, if I may, to a couple of Mr. Chizewer's

23    points.

24        Of course, it won't surprise you, Your Honor, that we

25    dispute the homes have decreased in value.  I don't want to get

 1   into too much of the substance here, although Your Honor has

 2   questions.  But the plaintiff this week that we deposed didn't

 3   know any of the facts, supposedly, supporting the claim that

 4   the property had decreased in value and disputed much of the

 5   information that was in his interrogatory responses.  So we

 6   have real concerns and questions about the claims in this case.

 7        Also, the plaintiffs are seeking very significant damages

 8   for emotional distress.  No settlement demand has been made,

 9   but there were calculations provided in responses to discovery.

10   And they are seeking a lot of money, so I don't think this is

11   the limited case.

12           THE COURT:  Is it a case you are interested in trying

13   to get resolved?

14           MS. REITER:  Your Honor, I think at this point it is

15   not clear to us that there are viable claims, and so, you know,

16   certainly Mr. Chizewer is welcome to make a settlement demand.

17   But we need to go through the process and determine whether

18   these plaintiffs actually have viable claims here.  We think

19   early discovery is going to show that many of them do not,

20   perhaps all of them do not.

21        And one important fact here is that all of the plaintiffs'

22   homes have already been remediated by EPA.

23           THE COURT:  How old was that person you deposed?

24           MS. REITER:  I'm sorry?

25           THE COURT:  How old was the person that you deposed?

 1            **MS. REITER:**  Forty-eight.

 2            **THE COURT:**  How long had they lived at that

 3    property --

 4            **MS. REITER:**  Three years.

 5            **THE COURT:**  -- do you remember?

 6            **MS. REITER:**  Three years.

 7            **THE COURT:**  Did they buy the property after the

 8    disclosure?

 9            **MS. REITER:**  It's a complicated situation,

10    Your Honor.  It actually is the plaintiff's father's home, not

11    the plaintiff's home.  The plaintiff had --

12            **THE COURT:**  So he got it from his dad when his dad

13    died?

14            **MS. REITER:**  No.  His dad is still alive, and his

15    father retained a life estate in the property.  But upon the

16    father's death, it was supposed to transfer to the plaintiff

17    and three of his siblings.

18            **THE COURT:**  Uh-huh.

19            **MS. REITER:**  And so that was the interest in the

20    property.

21            **THE COURT:**  Okay.

22            **MS. REITER:**  But as I was noting, Your Honor, all of

23    the homes in the area have been remediated by EPA.  EPA has

24    said that further remediation would be inappropriate here.  The

25    soil is clean.  There's no work to be done, and yet the

1  plaintiffs in their complaint are seeking costs for additional

2  remediation and testing of the properties.  We don't understand

3  that.

4      In addition, Mr. Chizewer just said that this case is only

5  about soil in response to your ground water question.  But if

6  you look at the complaint, Your Honor, the complaint says this

7  is a case about ground water and that they want remediation for

8  their ground water.  So the complaint is quite sprawling.

9      And one of the things we intend to do through early

10  discovery is figure out what actually is at issue here.

11  Because if you read the complaint, it's really not clear.

12  There are 10 different contaminants that are listed in the

13  complaint.  We have no understanding of why they think those

14  contaminants beyond the two the EPA was focused on are even at

15  issue in this case here.

16      **THE COURT:**  So can I just ask:  When did Atlantic

17  Richfield vacate that property?

18      **MS. REITER:**  1946.

19      **THE COURT:**  So this was -- reading the Seventh

20  Circuit opinion on the federal officer issue, this was all sort

21  of World War II-related munition site or whatever?

22      **MS. REITER:**  Correct, Your Honor.  The facility made

23  a number of wartime goods for the World War II war effort,

24  which is why we are in this Court.

25      **THE COURT:**  So then when did -- when they vacated the

1   property, who did it go to at that point?

2         **MS. REITER:**  They sold it to a third party that isn't

3   a party to this case.

4         **THE COURT:**  That's not part of the case?

5         **MS. REITER:**  Correct.

6         **THE COURT:**  Okay.  That's very helpful.

7      Anything else you want to add from your perspective?

8         **MS. REITER:**  No, Your Honor.

9         **THE COURT:**  All right.

10     Ms. Costello, let me ask, from your point of view, does

11  that sort of -- am I -- are you on this case?

12        **MS. COSTELLO:**  Yes, we are in this case.

13        **THE COURT:**  I'm getting confused here.

14     Does that sort of capture your position too, or do you

15  want to be heard on anything else?

16        **MS. COSTELLO:**  That captures our position as well.

17  Thank you.

18        **THE COURT:**  Okay.  How is it that DuPont -- when were

19  they involved in the property?  Why are they in the case?

20        **MS. COSTELLO:**  They have never been involved in that

21  specific property.  DuPont owned and operated on a parcel of

22  land that's adjacent to the U.S.S. Lead Superfund site, and the

23  complaints in these cases generally complain about specific

24  products that were made between 1910 and 1949 that contain lead

25  and arsenic.  DuPont continued to make different products there

1   up until about the early '90s, but those products aren't really

2   at issue.

3           **THE COURT:**  Do they own the property any longer?

4           **MS. COSTELLO:**  No, they no longer own the property.

5           **THE COURT:**  Okay.  So did you all make a federal

6   officer issue?

7           **MS. COSTELLO:**  We did, yes.  The property was

8   effectively taken over by the federal government.  The federal

9   government built a plant and the specific product was made

10  there and that product resulted in waste streams that included

11  lead and arsenic and so that's why the Seventh Circuit upheld

12  federal officer removal.

13          **THE COURT:**  Okay.  That's really interesting.

14      Thank you.

15      Do you want to respond to any of that?

16          **MR. CHIZEWER:**  All I would say, Your Honor, is,

17  again, many of our clients in this case are elderly.  They are

18  of limited means.  They don't necessarily know the value of

19  their property.

20      There was an administrative record and a record of

21  decision issued by EPA which, according to EPA, makes it clear

22  that the lead and arsenic that's been found on these people's

23  properties was -- that both ARCO, as the successor, and DuPont

24  are responsible, at least in part.

25          **THE COURT:**  But it has been remediated in the

1   meantime?

2           **MR. CHIZEWER:**  It has been remediated.  That

3   obviously doesn't -- first of all, there is the issues of the

4   loss of the property, you know, the enjoyment of the property

5   during the remediated process.

6           **THE COURT:**  I understand that.

7           **MR. CHIZEWER:**  And it has been remediated with

8   respect to those -- it was only tested with respect to two of

9   the contaminants even though the administrative record shows

10  that there may have been many more contaminants on there.

11      Nevertheless, Your Honor, I've made clear -- obviously,

12  our complaint made -- wanted to make all the claims we could

13  possibly name.  I have made it crystal clear to the defendants

14  what it is the case is about and what we're seeking here, and

15  it has to do with the emotional distress from learning that

16  their ground soil or their neighbor's ground soil has been

17  contaminated with lead and arsenic way exceeding the health

18  levels and the diminution of property value that resulted from

19  that.  Because who wants to live there?

20          **THE COURT:**  I understand.

21      What I want to make sure I'm understanding -- presently,

22  are you contending that that contamination continues on these

23  properties or has it, in fact, been, to your satisfaction,

24  remediated by the EPA?

25          **MR. CHIZEWER:**  Some people believe that based on what

1  they saw happening at their property that it may still be

2  contaminated, but we don't know that to be true.

3          **THE COURT:**  You don't know that?

4          **MR. CHIZEWER:**  Right.

5          **THE COURT:**  And you have not done subsequent testing?

6          **MR. CHIZEWER:**  We have not done that, Your Honor.

7          **THE COURT:**  Okay.

8          **MS. COSTELLO:**  Your Honor, may I clarify?

9          **THE COURT:**  Sure.

10         **MS. COSTELLO:**  Mr. Chizewer suggested that the CERCLA

11  liability suggests that Atlantic Richfield and DuPont have been

12  found to have caused the contamination, but that's not the

13  standard under CERCLA.  CERCLA is a specific statutory scheme.

14  It is designed -- liability under CERCLA is not --

15         **THE COURT:**  I fully understand that.

16         **MS. COSTELLO:**  I just want to make sure that's clear

17  for the record.

18         **MR. CHIZEWER:**  Obviously, we have to prove it.  We

19  can't just --

20         **THE COURT:**  Rely on that.  I understand.

21      Let's go to the *Baker* case here because I'm going to run

22  out of time.  I have to go.  My wife is going to kill me.

23      So the *Baker* case.  We're back to you, Mr. Flora, correct?

24         **MR. FLORA:**  Yes, Your Honor.

25         **THE COURT:**  Let me just get to my notes here.

```
 1        Okay.  And, again, you, Ms. Costello, and Mr. Connor,
 2   correct?
 3             MR. CONNOR:  Correct.
 4             THE COURT:  Again, just give me a quick synopsis of
 5   where you are on that case.
 6             MR. FLORA:  Basically, at this point, we are in the
 7   exact same spot we are with Holiday and Barbee.  There's
 8   approximately 40 plaintiffs in that case.
 9             THE COURT:  Okay.  And fully briefed motions to
10   dismiss as of January of this year, right?
11             MR. FLORA:  As of January 17.
12             THE COURT:  Just a couple weeks ago, or a week ago.
13        Mr. Connor, do you want to add anything about what's going
14   on in that case, anything unique that you think is important
15   that I know about?
16             MR. CONNOR:  No, Your Honor.
17        From my perspective, the Baker case, aside from the fact
18   it is a different grouping of individual plaintiffs,
19   procedurally, is in the same place as the cases we have been
20   talking about, aside from the case that has the class action
21   claim, which is the Allen case.
22             THE COURT:  Can you give me just a little bit of
23   insight?  I now have a little bit of insight about ARCO and
24   DuPont and their role.  Can you just give me a little
25   background information on what is the Hammond Group?  What did
```

1  they do?  Just give me a little information.

2          **MR. CONNOR:**  Sure.  Your Honor, the Hammond Group is

3  a company that has a couple of facilities which are quite far,

4  relatively speaking, from the sites at issue here, the housing

5  complex and the school.

6      The Hammond Group facilities, I think -- I tried to

7  eyeball it on Google Maps -- is about a mile-and-a-half as the

8  crow files south of the sites.

9      The Hammond Group has varied a little bit over time, but

10  they are in the business of producing lead oxides.  Lead oxides

11  are used for various purposes largely involving batteries.

12      In that process, the lead is the product.  It is not the

13  byproduct.  So the way they do their business is such that lead

14  is captured, used, and sold, not emitted in large quantities.

15  So I think -- you know, we believe that as things go forward,

16  if they go forward, we'll find that it's probably physically

17  impossible that emissions of any sort from the Hammond Group a

18  mile-and-a-half away could have found their way onto the

19  properties at issue here.

20          **THE COURT:**  Do they sill operate at the site?

21          **MR. CONNOR:**  They do, Your Honor.

22          **THE COURT:**  When I say "the Hammond Group," does that

23  capture a number of different defendants in the case, or is

24  that just an umbrella?

25          **MR. CONNOR:**  Yes.

```
 1              THE COURT:  I don't understand.

 2              MR. CONNOR:  There are four defendants that we

 3     typically just aggregate for purposes of briefing.  The Hammond

 4     Group and Hammond Lead are the two that are really operating in

 5     the area.  The other one produces stabilizers.  I don't think

 6     they use lead anymore for that.  At one time I believe they may

 7     have for purposes of, I think, PVC production -- or supplying

 8     in the PVC production process.

 9          The other ones are not really ongoing enterprises.

10     Halstab, I believe, was really just a shell company that was

11     created at one time and never really used for anything, and

12     then Halox was dissolved over 10 years ago.

13              THE COURT:  Okay.

14              MR. CONNOR:  We haven't concerned ourselves too much

15     with which ones are the real entities, at least not yet.  But I

16     think they -- in terms of the allegations being made, we've, at

17     least for purposes of briefing on the pleadings, treated them

18     as a single enterprise.

19              THE COURT:  Okay.  That's helpful.  Thank you.

20          So, Ms. Costello, do you want to weigh in on anything as

21     it relates to this case?  Same posture?

22              MS. COSTELLO:  Correct.

23              THE COURT:  So on all of these cases where there's

24     the pending motion just in the last couple of weeks that's now

25     in my bailiwick, do they all argue the same basic points?
```

1          **MR. FLORA:**  Yes, Your Honor.

2          **THE COURT:**  Is there anything unique about the

3   briefing in any one of them that would -- I don't have to issue

4   four opinions?  I would like to just consolidate this for

5   purposes of, you know, the motions to dismiss.

6          **MS. COSTELLO:**  The only clarification I would make is

7   there are some arguments that apply only to specific

8   plaintiffs.  So it's not like the arguments apply to all

9   plaintiffs across the board.  So there is, unfortunately,

10  Your Honor, some parsing that needs to be done to specific

11  plaintiffs.

12         **THE COURT:**  But, of course, that's just something I

13  could work into the opinion, right?

14         **MS. COSTELLO:**  Yeah.

15         **THE COURT:**  As opposed to producing four opinions or

16  what have you.  I guess that will be up to me.

17      All right.  You want to say anything else on that?

18         **MR. FLORA:**  I think one opinion could answer all

19  three questions, Your Honor.

20         **THE COURT:**  Okay.  So now we're up to the *Adams* case.

21  This one, frankly, confused me the most, candidly, as I went

22  through the docket.

23      So that's you, Mr. Amatore, right?

24         **MR. AMATORE:**  Yes, sir.

25         **THE COURT:**  And then we have -- so Atlantic Richfield

```
 1    is out of this case now, right?

 2            MR. AMATORE:  Not this one, no.

 3            MS. REITER:  No, Your Honor.  Yes, we are still a

 4    defendant in Adams.

 5            THE COURT:  Okay.  And as are the other two

 6    defendants.

 7         So talk to me a little bit about what this case -- same

 8    thing.  Why did this take so long?  This thing was first

 9    filed --

10            MR. AMATORE:  Sure, Judge.  What --

11            THE COURT:  -- five years ago.

12         Let me finish.

13            MR. AMATORE:  Yes, Judge.

14            THE COURT:  Let me finish.

15            MR. AMATORE:  Sorry.

16            THE COURT:  -- five years ago.  And why -- is it just

17    because you happened to get different clients and that's why

18    your case is a separate case from the ones that Mr. Flora has

19    brought?  It's the identical case though, right?  It's the

20    housing complex residents and people that went to the

21    elementary school?

22            MR. AMATORE:  And a few adjacent people on private

23    property.

24            THE COURT:  Oh, there is.  Okay.

25         So talk to me about your perspective on this.  What are we
```

1  doing?

2  **MR. AMATORE:**  Judge, I would like to mention -- it

3  has been slightly mentioned.  The case was removed in 2018.

4  There was remand proceedings, okay.  We filed our amended

5  complaint two months after the case was removed to federal

6  court.  Then it went into the remand proceedings, which the

7  *Baker* case was on appeal, so we had to wait for that.  The

8  first motion to dismiss our complaint was in the summer of

9  2000, our first amended complaint.

10  **THE COURT:**  2020.

11  **MR. AMATORE:**  2020.  Excuse me, Judge.

12  And it has proceeded at pace, from our perspective.

13  The reason we're behind now is because, like everyone

14  else, all of our injury claims were dismissed for failure to

15  plead a present actual physical injury, okay.  Some plaintiffs

16  have pled what you might call soft injuries:  Nausea, learning

17  disabilities, that kind of thing.  Those passed muster.  We

18  didn't do those, but some others did.  Those passed muster with

19  a caveat of good luck on proving it.  Judge Kolar colloquially

20  saying that.  He said -- but what happened was he granted --

21  after Judge Van Bokkelen dismissed everything, everyone was

22  granted leave to file a motion for leave to file an amended

23  complaint.

24  Our motion for leave to file the complaint was heavily

25  criticized by Atlantic Richfield, and we have to say it was

```
 1    unclear.  We had some bad terminology and there was some lack
 2    of clarity.  And so during the briefing schedule, you know, the
 3    judge actually chimed in, Judge Kolar, during the briefing
 4    schedule.  The point is, we were given a lot of instruction
 5    from Judge Van Bokkelen and then a lot from Judge Kolar on what
 6    we needed to do, and we have done that.  We have been granted
 7    leave now to file our second amended complaint.
 8              THE COURT:  That was filed last week, right?
 9              MR. AMATORE:  Yes, sir.  We expect a motion to
10    dismiss.
11         However, all of the substantive issues have been ruled
12    upon by -- unless there's new ones -- by either
13    Judge Van Bokkelen or Judge Kolar.  All we intended to do was
14    follow their instructions.  We believe we did that, so we
15    believe we are going to be an issue.
16              THE COURT:  Okay.
17         So let me talk to you first, Ms. Costello.  I'm sorry.  I
18    assume you will be filing a motion to dismiss?
19              MS. COSTELLO:  Yes, Your Honor.  And this case is a
20    little different in that it also asserts strict liability
21    claims and nuisance claims.  And given the way that
22    Judge Van Bokkelen ruled on the prior motion to dismiss, there
23    are issues here that would be new in this motion to dismiss,
24    which we are working on as we speak and will file promptly.
25              THE COURT:  Okay.
```

```
 1              MR. AMATORE:  Judge, may I report also -- I think it
 2    is important to understand from our perspective, because
 3    we've -- you know, we've come -- we've come to have to accept
 4    this -- we have three plaintiffs with present physical injuries
 5    that we can plead and prove.  There's a cancer in one case.
 6    But we have three plaintiffs with present physical injuries.
 7    We're proceeding largely on the emotional distress claims,
 8    which were all dismissed originally because they -- supposedly
 9    it is not a standalone tort in Indiana, has to be derivative of
10    some other claim.  And if it's derivative of the negligence
11    claim, there's no injury on the negligence claim; therefore,
12    nothing to derive from, and they were dismissed.
13         However, I filed an additional memorandum and, I believe,
14    convinced the Court about the modified impact rule in Indiana
15    and that because we ingested the lead we satisfied the impact.
16    Remember, just touching the truck, you know, was sufficient.
17    We satisfied the impact rule, and so we want to proceed our --
18    so our case is, of 60 plaintiffs, 57 of them really have -- we
19    have a nuisance claim against DuPont.
20         But 57 of them, what it's really all about are the
21    negligent infliction of emotional distress claims.  We've been
22    very transparent about that and won't want to go into discovery
23    and have to prove present actual physical injuries when we
24    can't.  We have also answered interrogatories to that effect.
25         So we're proceeding -- just to give some understanding of
```

1    the claim, we're proceeding -- ours is largely, except for

2    three people, an NEID claim.

3            **THE COURT:**  Ms. Reiter, do you want to talk about any

4    of this?  I do want you to explain to me -- 'cause I really

5    didn't understand -- there was some kind of snafu with

6    Judge Kolar's order about whether they could bring the claim

7    against you guys or not or whether they did.  I don't

8    understand it.  You understand what I'm getting at?

9            **MS. REITER:**  Yes, I do, Your Honor.

10            **THE COURT:**  Can you explain it to me?

11            **MS. REITER:**  Certainly.  The way the proposed second

12   amended complaint -- the first proposed amended complaint was

13   drafted led Magistrate Kolar to believe that plaintiffs were

14   not trying to assert any claims against Atlantic Richfield

15   Company; and, therefore, in ruling on that original motion for

16   leave to amend, Magistrate Judge Kolar didn't address any of

17   the arguments that we made because he thought we weren't in the

18   case.

19       As it turned out, plaintiffs were intending to pursue

20   claims against Atlantic Richfield on behalf of just four of the

21   plaintiffs.  So the vast majority of the plaintiffs in the case

22   resided in the housing complex and for reasons you referenced

23   earlier cannot bring a suit against Atlantic Richfield Company.

24       However, there is one family of four that lives in a

25   private home outside of -- not in the former housing complex,

1    and they are seeking to pursue claims against Atlantic

2    Richfield on behalf of those four plaintiffs.

3              MR. AMATORE:   Three of those have injuries of the

4    four.

5              MS. REITER:   Actually, they've only pled injuries as

6    to two of the four.

7         And so we filed a motion for reconsideration pointing out

8    to Magistrate Judge Kolar that, in fact, we understood

9    plaintiffs to be trying to assert claims against Atlantic

10   Richfield Company and, therefore, asking him to address our

11   arguments.

12        He then ordered plaintiffs' counsel to try again, and they

13   filed a couple different versions of the second amended

14   complaint that tried to clean up the errors that Magistrate

15   Judge Kolar had identified.   And, finally, the most recent

16   motion for leave to amend was granted just last week.   And the

17   plaintiffs just filed their second amended complaint on Monday.

18        Does that answer your questions, Your Honor?

19             THE COURT:   Yes, I understand it now.

20        And then, of course, you are going to be filing a motion

21   to dismiss that, right?

22             MS. REITER:   We will, Your Honor.

23        And I just want to make a couple points, which is we

24   dispute that all the substantive issues have been ruled on.   Of

25   course, we also may make additional new arguments in this case,

```
 1    we certainly are allowed to, in this motion to dismiss.  And of
 2    course Your Honor is not bound by a decision that
 3    Judge Van Bokkelen made in the *Alvarez* case in this case
 4    anyway.
 5         And I won't, unless Your Honor is interested, get into a
 6    lot of the substance on the emotional distress claim, but we
 7    believe we have very strong arguments as to why these
 8    plaintiffs cannot state an emotional distress claim.
 9         Specifically, we do not believe under Indiana law that
10    they can establish that there was any direct physical impact,
11    and one of the reasons for that is that Indiana law -- and this
12    is a Supreme Court decision from Indiana that I'm referencing
13    here -- requires that the plaintiffs be at the scene of the
14    allegedly negligent conduct and be physically impacted in a
15    direct manner.
16         Obviously, if Atlantic Richfield ceased operating in 1946,
17    these plaintiffs could not have been at the scene of the
18    injury-producing conduct.
19              THE COURT:  I guess it just depends what that means,
20    right?
21              MS. REITER:  Right.  But, Your Honor -- right.
22              THE COURT:  I'm not going to argue the point.
23              MS. REITER:  We'll get into the details, Your Honor,
24    but I just wanted to make clear that we believe we have very
25    strong arguments in favor of dismissal here.
```

```
 1              THE COURT:  Okay.

 2         What is the physical injury?  You said cancer.

 3              MR. AMATORE:  It's not a physical injury, Judge.

 4    It's a direct impact.  When you inhale this stuff --

 5              THE COURT:  That's not what I'm getting at.  You said

 6    you had four plaintiffs who actually had some disease or

 7    some --

 8              MR. AMATORE:  Yes, Judge.

 9              THE COURT:  What is that?

10              MR. AMATORE:  Well, cancer.  I believe two instances

11    of cancer and then the other one is softer than that.

12              THE COURT:  Aren't there some that are like, oh, I

13    have a kid who is overweight?  I read that somewhere.

14              MR. AMATORE:  Those are the other people.  We didn't

15    go that route.  We don't plead the soft injuries.  We either

16    plead actual present physical injuries or we admit we are

17    proceeding on emotional distress.

18              THE COURT:  Understood.  I understand.

19              MR. AMATORE:  We don't have that middle ground.  That

20    does exist in the other cases.

21              THE COURT:  I understand.

22         Okay.  So when are you guys going to have those briefs on

23    file?

24              MS. REITER:  Your Honor, the opening briefs are due

25    February 6 and should be fully briefed by March 6.
```

 1          **THE COURT:**  Do you plan to meet those deadlines?

 2          **MS. REITER:**  We do.  Atlantic Richfield does.

 3          **MS. COSTELLO:**  DuPont defendants do as well.

 4          **THE COURT:**  Okay.  I'm not going to give you any time

 5     to ask for more time to respond to it, okay.

 6          **MR. AMATORE:**  You got it, Judge.

 7          **THE COURT:**  You understand.

 8       All right.  Last case.  This is the one most recently

 9     filed.  This is the one I got from Springmann because it made

10     sense to send it over to me.

11       This is -- we have Mr. Flora, Ms. Costello, and

12     Mr. Connor, and this is the one that has the class allegations

13     that we talked a little bit about.

14          **MR. FLORA:**  Yes, Your Honor.

15          **THE COURT:**  Just help me out.  Where are we at on

16     this and where we going?

17          **MR. FLORA:**  This is the newest-filed case.  We had to

18     file it in state court because the grounds for jurisdiction we

19     can't invoke, defendant has to because it is federal officer

20     removal.  But otherwise it's in the same procedural posture as

21     the other three cases with the added part of they have motions

22     to strike the class allegations.  Otherwise, even though it is

23     the newest case, they are all in the same posture.

24          **THE COURT:**  How many plaintiffs you have in this

25     case?

1        **MR. FLORA:**  This one is 11 plaintiffs.

2        **THE COURT:**  Okay.  So what would happen if -- let's

3   say this survives a motion to dismiss.  I have your motion for

4   class certification.  I know you strongly disagree that -- but

5   would it then subsume all the other cases?

6        **MR. FLORA:**  Wouldn't subsume all of them.  It would

7   take probably the vast majority, at least two-thirds, probably

8   three-quarters of them away because it would pull all of the

9   minors into one case.

10       **THE COURT:**  Why are the minors -- would they be in a

11  class but other people would not?

12       **MR. FLORA:**  It is a statute --

13       **THE COURT:**  I know counsel made that point.

14       **MR. FLORA:**  It is a statute of limitations issue.

15  Because anyone who has filed a case already, we didn't see it

16  necessary to file a class action on their behalf.  Frankly, we

17  would be in favor of doing so.  We just haven't done so.

18  Because any of the adults, since all of this would go back to

19  that June 2016 letter, or maybe it is July, but the 2016 letter

20  from Mayor Copeland, we see that as starting the statute of

21  limitations.  These are all personal injury cases, that's two

22  years statute of limitations.  At this point, we couldn't bring

23  a class case on behalf of any adults.

24       So if the class definition applies just to the minors, we

25  would still be able to bring a case.  It would incidentally

1  grab all of the filed minors cases, but the bigger intention of

2  it is to just take the universe of minor cases, bring them

3  before the Court, get them all resolved at once.

4          **THE COURT:**  All right.

5      I understand your position on that.  Do you want to say

6  anything else about that?

7          **MS. COSTELLO:**  No, Your Honor.

8          **THE COURT:**  Okay.  And, Mr. Connor, do you want to

9  say anything more about that?  It seems like it's in the same

10 posture.  Is that fair?

11         **MR. CONNOR:**  I agree, the same posture, aside from,

12 obviously, the significant issue of a class action and the

13 toxic tort action, which I'm sure we'll discuss at length at

14 some point all the reasons why defendants would believe that

15 that would be both unworkable and probably not really

16 contribute anything to the conduct of the cases.  So we have a

17 lot of feelings about that.  But as far as the individual

18 plaintiffs and the procedural posture, I would agree that it's,

19 from my perspective, the same as the other cases that we have

20 with Mr. Flora.

21         **THE COURT:**  Yeah.

22     Okay.  Let me look at my list of questions here and make

23 sure I got everything answered here.

24     Are you anticipating filing any additional cases?

25 Anybody?

1      **MR. FLORA:**  No.

2      **MR. AMATORE:**  No, sir.

3      **MR. FLORA:**  Not unless somebody came to us and said

4  they need a minor's case filed.  Otherwise, no.  We did expect

5  to get them.

6      **THE COURT:**  That's a big -- I mean, that could happen

7  tomorrow, I suppose.

8      **MR. FLORA:**  Your Honor, if we certify the class, then

9  we don't have to.

10      **THE COURT:**  Yeah.  I understand.

11     Is there a reason these cases, if not actually

12  consolidated, can be consolidated for purposes of discovery or,

13  at the very least, is that sort of effectively happening

14  anyway?

15      **MS. COSTELLO:**  Your Honor, it has, to an extent.  We

16  would say they can appropriately be -- well, with the

17  exception -- well, we would say they could be coordinated for

18  purposes of discovery.  And to some extent, that's already

19  happened.

20     For example, Magistrate Judge Kolar has held hearings in

21  all cases collectively.  He had all plaintiffs' counsel weigh

22  in on the written discovery that the *Alvarez* plaintiffs served

23  on defendants, and the other plaintiffs signed off on that.  So

24  while they weren't entitled to discovery yet, they have at

25  least reviewed and agreed, you know, this looks like what they

1   are seeking, to try to avoid duplicative discovery issues.

2       The other issue that's been coordinated is the protective

3   order.  The only case where we've reached that phase is in the

4   *Alvarez* case, but the counsel in the other cases have signed

5   off on the protective order.

6       So once we get the pleadings cleaned up and we know the

7   proper parties, the proper claims, who can proceed against who,

8   we think discovery can proceed pretty efficiently because we

9   basically have the protective order.  Plaintiffs have signed

10  off on discovery requests.  We are coordinating those things

11  that can be done.  That's what's happening so far.

12          **THE COURT:**  All right.

13      So let me ask you, Mr. Flora, from your perspective -- you

14  represent 300 people or whatever it is?

15          **MR. FLORA:**  Right.

16          **THE COURT:**  What do you want out of this case?  Is

17  this case about money?  Is that it?

18          **MR. FLORA:**  I think ultimately, yes, it's primarily

19  about money.

20          **THE COURT:**  What's this issue about *medical*

21  *monitoring*?

22          **MR. FLORA:**  That may be the necessary source for the

23  money.  I mean, one of the potential avenues of relief that may

24  be sought in Indiana is medical monitoring where, basically, a

25  fund could be set up to pay for these people to continue to get

1    care, supervision for conditions that maybe haven't manifested

2    now but may have to manifest down the line.

3            **THE COURT:**  In any of these cases, have any of them

4    been to mediation, explored any kind of settlement discussions

5    at all in the seven years since these have been filed?

6            **MR. FLORA:**  Your Honor, in our cases -- in these

7    federal proceedings, we have not been to mediation.  We are

8    always open to it.  We certainly would be open to any early

9    settlement.

10        What we've sensed from the defense is we're going to need

11   to at least get past motions to dismiss before they are

12   going --

13           **THE COURT:**  Yeah, I understand.

14        Trust me.  I'm going to get opinions out to you as

15   promptly as I reasonably can.

16           **MR. FLORA:**  Yes.

17           **THE COURT:**  I have 300 other cases.  I'm going to do

18   my best.  But in the next two to three months, we'll get

19   opinions out to you.

20           **MR. FLORA:**  Okay.

21           **THE COURT:**  And then I would fully expect at that

22   point, if the cases are going forward, then it might behoove

23   people to explore that option.

24           **MR. FLORA:**  Your Honor, for example, in the state

25   cases, we are set for mediation in May in that case.  So

```
 1   hopefully we can get that one knocked out and hopefully it
 2   gives us a good idea of how we can work through it in these
 3   cases too.
 4       I do believe, and perhaps I'm wrong -- I believe in
 5   Alvarez there may have been a resolution with one of the
 6   defendants.  I'm not certain on that.  Looking at the docket,
 7   it looks like there may have been resolution with U.S. Smelter.
 8           MR. AMATORE:  In terms of Adams, Your Honor, because
 9   we're proceeding on the emotional distress claims, we don't
10   have complicated issues of injuries.  We feel we are
11   particularly ripe for some sort of mediation.
12           MS. COSTELLO:  Your Honor, just to clarify.  There
13   are personal injury claims in the Adams case.
14           MR. AMATORE:  Well --
15           THE COURT:  Do you happen to know what the cause
16   numbers are in the state court cases?
17           MR. FLORA:  I can pull them up quickly.
18           THE COURT:  Here is what I'm going to ask you to do.
19   Send an email to my docket clerk, Noel, when you get back to
20   your office or after the hearing.
21           MR. FLORA:  I will get it after the hearing.
22           THE COURT:  I want to look at those dockets.
23           MR. FLORA:  Yes, Your Honor.
24           THE COURT:  I interrupted you.
25           MS. COSTELLO:  That was it.
```

1          Mr. Amatore was saying his case is simple because it is

2     all about emotional distress, which is a complicated issue in

3     and of itself, but there are personal injury claims in that

4     case.

5               **MR. AMATORE:**  Right.  But a small number, Judge.  I'm

6     just saying it is largely about emotional distress, almost

7     entirely.

8               **MS. REITER:**  And it is three plaintiffs who --

9               **THE COURT:**  Oh, it's three.

10              **MS. REITER:**  -- are claiming physical injury, yes.

11              **THE COURT:**  So do you know -- what is the nature of

12    the physical injury on those three plaintiffs?

13              **MS. REITER:**  Two -- only one of the plaintiffs who is

14    alleging cancer is actually suing Atlantic Richfield Company,

15    but that particular plaintiff claims ovarian cancer.  Her son

16    claims to suffer from a learning disability.  And then there's

17    a third plaintiff who is also claiming to suffer cancer.  I

18    don't remember what type.

19              **MS. COSTELLO:**  I don't recall either.

20              **MS. REITER:**  Not ovarian cancer, a different type of

21    cancer.

22              **THE COURT:**  Okay.

23          This has been tremendously helpful to me.  I know it is a

24    big endeavor getting everybody here.

25          Does anybody else want to say anything that we haven't

```
 1   talked about?  I have a couple more minutes.
 2            MR. FLORA:  Just one simple point.
 3        As far as the consolidation on discovery, something as
 4   simple as having just one filing that comes out that I don't
 5   have to save across four different subfolders with different
 6   ECF numbers would go a long way to helping make these dockets
 7   make sense.
 8            THE COURT:  Yeah, I don't understand that, at least
 9   on the four cases.  They look like mirror images of one
10   another, and I don't understand why we can't -- but the ball is
11   in his court to move to consolidate them.  I'm inclined to
12   consolidate them.
13        I'm not quite sure I'm understanding your resistance to
14   it.  You are not prejudiced at all by it, and you are making
15   life easier for a lot of people.  But you can think about it.
16   If you want to file that motion, file it, and we'll get right
17   on it.
18        Anybody else want to raise any other issue or talk about
19   anything?
20            MR. CHIZEWER:  Your Honor, just in anticipation of we
21   now all have to go over to Judge Kolar's courtroom for a
22   hearing there --
23            THE COURT:  That's what I understand.
24            MR. CHIZEWER:  -- and he's going to want to know
25   "What did Judge Simon say?"
```

```
 1            THE COURT:  He's listening.

 2            MR. CHIZEWER:  Okay.  That's good.

 3            THE COURT:  I think he is.  He told me that

 4   yesterday.  He was intending to.

 5            MR. CHIZEWER:  I wanted to be able to, at least,

 6   reflect accurately, sort of, your take of what's going on,

 7   whether there's going to be consolidation.  I mean, we

 8   obviously would object to the consolidation.

 9            THE COURT:  Yeah.  Your case is a little bit

10   different.  I understand that.

11            MR. CHIZEWER:  Understood.

12            THE COURT:  When you have different sets of lawyers,

13   I understand it is different.  But when I have the exact same

14   lawyers on both sides of the V and the plaintiffs are the same,

15   they are either resided at the housing complex or they went to

16   the elementary school, I don't understand why that wouldn't be

17   consolidated.  That's all I'm saying.  All right.

18        All right.  Thank you everybody.  Much appreciated.  Have

19   a good day.

20        (A recess was had at 11:50 a.m.)

21   * * *

22        (End of requested transcript.)

23

24

25
```

```
 1                          CERTIFICATE

 2        I, Stacy L. Drohosky, certify that the foregoing is a true

 3  and correct transcript from the record of proceedings in the

 4  above-entitled matter.

 5  Date:   February 6, 2023

 6                                      S/Stacy L. Drohosky
                                        S/STACY L. DROHOSKY
 7                                      Court Reporter
                                        U.S. District Court
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```